PENNSYLVANIA R. Co. *v.* ATHA and others.

*(District Court, D. New Jersey. January 7, 1885.)*

1. WHARVES AND DOCKS—AUTHORITY OF AGENT—INJURY TO VESSEL.

A. was the owner of a wharf at Newark, on the Passaic river, and the consignee of a cargo of coal shipped on board a barge belonging to libelant. When the barge arrived at the wharf the master found M. in charge, directing the moving of vessels, etc., and in obedience to his direction moored the barge along-side the docks and when the tide went out the barge grounded, and was seriously injured by piling that had been negligently left standing under the water. After mooring, but before the grounding of the barge, the master reported to the clerk of the libelant the arrival of the barge, and was referred to M. as his representative. *Held*, that the master had a right to assume that M. was the agent of the owner of the wharf, and that he was liable for the injury.

2. SAME—LIABILITY OF OWNERS OR OCCUPIERS.

The owner or occupier of a dock is liable for damages to a person who makes use of it by his invitation, express or implied, for an injury caused by any defect or unsafe condition of the dock, which he negligently causes, or permits to exist, provided the person himself exercises due care.

This libel is filed by the Pennsylvania Railroad Company, owners of the barge The Delaware & Raritan Canal No. 3, against Benjamin Atha & Co., to recover damages for injuries to the said barge whilst lying at the wharf of the respondents at Newark, on the Passaic river, under the following circumstances. On the sixth of November, 1878, Shaw Brothers, of Baltimore, shipped on board the barge 275 tons of Cumberland coal consigned to Benjamin Atha & Co., at the port of Newark, New Jersey. The barge, being towed by a steam-tug, proceeded on her trip and arrived at the wharf of the respondents in Newark about noon on the thirteenth of November. The master of the barge found another boat discharging its load at the derrick on the wharf, and a schooner lying outside of her. He requested the captain of the tug to put him alongside of the schooner, and threw a line to the canal-boat unloading, asking one of the hands on board to take the line. The only person on the dock was a Capt. Mullins, who was employed by the respondents as a stevedore to unload boats coming to the wharf, and who was then engaged in discharging the canal-boat. He forbade the crew of the boat taking the line, told the master of the libelant's vessel that he could not lie there, as he would be in the way, and directed the captain having the Delaware & Raritan Canal No. 3 in tow to drop her astern. The boat was dropped astern to the dock below, at the place pointed out by Mullins, and was fastened alongside of the respondents' dock, and was breasted off by his directions eight or ten feet from the dock, where Mullins assured him she would lie level and in safety. The master then was directed to the office of the respondents, near the wharf. He reported his arrival, and was told by a clerk to whom he handed the bill of lading, to see Capt. Mullins, who would give all needed instructions about discharging. Having thus moored the libelant's barge, under the superintendence of Capt. Mullins, the master left her about 2 or 3 o'clock in the afternoon, went up to the city of Newark, where he met some friends, and returned to the boat about dusk the same evening, and found her aground. He boarded her, and, after eating his supper, retired to bed. The barge had grounded with the fall of the tide, after several hours of flood. The master turned out about 11 or 12 o'clock that night to ascertain the condition of the boat. He found that she was full of water, not having risen with the rising tide. It was afterwards discovered that she had settled upon some obstructions in the bottom of the river, and had her bottom punctured with several holes, which caused her to leak so badly that she could not be raised except by the employment of wreckers, and after large expense and long delay.

We learn from the testimony of Atha that the respondents pur-

chased the property where the libelant's barge was placed in the spring of the year 1869. It was then used as a ship-yard, having no very permanent dock-line in front. There were two marine railways on the premises, used for hauling vessels out of the water onto the land, to be repaired, one of which prejected down for some distance into the river, and consisted of two parallel tracks, about 12 feet apart, and running nearly at right angles to the face of the dock, supported by wooden piles driven on the shore and in the bed of the river. There was a provision in the conveyance by which the grantor (Richards) excepted and reserved from the operation and effect of the deed all buildings, sheds, ways, and all movable things of every name and nature on said premises, hereby conveying nothing more than the land itself, and also reserving the use, occupation, and possession of the premises for one year from the date of the conveyance. By virtue of this reservation, the said grantor occupied the premises for a year as a ship-yard, and, at the expiration of the year, removed the buildings and the ground-ways, tracks, and machinery of the said marine railways, to an adjoining property which he had purchased, leaving upon the premises the piles on which the railways had been placed. When the respondents made the purchase there was an old spile dock in front of the property—piles driven and capped, with plank on their top. The respondents built a new dock and bulk-head, extending the same a few feet further into the river, and using, to some extent at least, the piles that had been left of the marine railways in the new construction. When the dock was filled in, such of the pilings as were standing within the bulk-head were covered up by the respondents, but those in the bed of the river outside were not removed, either by Richards & Brown or the respondents, after they purchased the property. From the testimony of Mr. Everett there seems to be no reasonable doubt that the injury to the libelant's barge was caused by these pilings left in the river. Mr. Brown thinks that the railway extended into the river 30 or 40 feet outside the dock-line, but does not know what supported it, or that there were any piles driven in the bed of the river. Mr. Atha testifies that he was never informed that there were any pilings there, but does not say that he ever took any pains to ascertain whether there were or not. After the injury to the libelant's barge, the respondents employed Mr. Van Ness to remove the piles from the river bed. He says he found and pulled up 12 or 14, 4 or 5 of which were 8 or 10 inches above the mud, and about 2 feet under water at low tide.

*Wilcox, Adams & Macklin,* for libelant.

*McCarter, Williamson & McCarter,* for respondents.

Nixon, J. The decision turns upon two questions: (1) Were the respondents responsible for the acts of Mullins in regard to the location of libelant's barge? (2) Did they possess such knowledge of the circumstances of the property, when they purchased, as to put them upon inquiry concerning the condition of the river bed in front? If

the facts shown in the testimony warrant the answer of both these questions in the affirmative, there should be a decree for the libelant; if not, the libel must be dismissed.

1. In regard to the first, the respondents were the owners of a wharf upon a public, navigable river, to which vessels loaded with freight were in the habit of coming. In the present case, and, perhaps, generally, the respondents were the consignees of the cargo. The master of the libelant's barge was a stranger there, and Mullins was the only person he found on the premises who assumed any responsibility in directing him where to go, or what to do. He was engaged as stevedore in unloading all vessels consigned to the respondents, and was paid by them for his services, the amount being afterwards deducted by the consignees from the freight due to the master. Mr. Atha testifies that, although no person had special authority over the wharf, or arriving vessels, it was necessary for Mr. Mullins, in the course of his duties, to request the captains to move their boats, so that it would be possible for him to unload them; and that, so far as it appertained to all that was necessary for him to continue his work, he made them—requested them—to lie here or there, as a matter of course. Page 186 of Record. He was aware that Mullins was in the habit of exercising such authority, and never found fault with him for so doing. In addition to this, it appears that, after the master had moored the barge alongside of the dock, under Mullins' specific directions, he reported to the clerk of the respondents in the office, and was referred by him to Mullins, as the representative of the consignees in the matter of discharging the cargo.

I do not think it is competent, under the circumstances, for the principal to shield himself from the responsibility of the acts of his agent by setting up that he did not authorize the act from which the injury arose. The master of the barge had a right to assume that the single person he found in the employ of the consignees could speak and act in their behalf, and that, when so speaking and acting, he was not overstepping the limits of his employment. The case is much stronger than the recent one of *Barber* v. *Abendroth*, in the supreme court of New York, (26 Daily Reg. 148.) Suit was there brought to recover damages sustained by the boat of the plaintiff while moored at the defendants' wharf on Byram river at Port Chester. She was taken to the wharf laden with sand, consigned to the defendants. A contract had been entered into with the defendants by Whitehead Bros. for the sale of the sand and its delivery to the defendants at their dock. The plaintiff arrived with the sand in the vicinity of the dock near the middle of the night. He found a watchman on the dock. He had received no directions as to where he should place his boat to have the sand unloaded. He applied to the watchman, who was there in the service of the defendants, for directions as to where the sand was wanted, and the watchman said he could not tell; but in the course of the interview he indicated to him a point on the wharf

where sand had previously been received by the defendants. He went to that point, and was assisted by the watchman in securing his boat. When the tide went out the boat rested on the ground, which proved to be so uneven that the boat settled about her midships, receiving the injury which was the subject of the action. It was proved on the trial that the watchman's duties were limited to the protection of the premises from fire or burglary. "But," says the court, "the fact that the watchman was upon the premises, in their apparent charge and possession, was a direct indication that he so far represented the defendants as to be authorized to indicate what might properly be done by a vessel arriving at the wharf on the defendants' business during the night-time when no other person was to be found who could be at the time consulted. The fact of his being there, in the service of the defendants, was an indication that it was his duty, as well as his authority, to look after their affairs, and in so simple an act as the moving of a vessel, could indicate where she might be properly or safely placed." The court sustains its position by quoting its oft-repeated adjudication, that—

"The principal is, as to third persons not having any notice of a limitation, bound by the ostensible authority of the agent, and cannot avail himself of secret limitations upon the authority and repudiate the agency where innocent third persons have in good faith acted upon the ostensible authority conferred by the principal." *Doubleday* v. *Kress*, 60 Barb. 181; *Lefler* v. *Field*, 50 Barb. 407; *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325.

2. With regard to the second question, there is not so much dispute or difficulty about the law as there is in its application to the facts. The owner or occupier of a dock is undoubtedly liable for damages to a person who makes use of it by his invitation, express or implied, for an injury caused by any defect or unsafe condition of the dock which he negligently causes or permits to exist, provided, of course, the person himself exercises due care. He is not an insurer of the safety of his dock, but he is required to use reasonable care to keep it in such a state as to be safe for the use of vessels which he invites to enter it, or for which he holds it out as fit and ready. If he fails to use such care,—if there is a defect which is known to him, or which, by the use of ordinary prudence and diligence, should be known to him,—he is guilty of negligence, and liable to the person who, using due care, is injured thereby. *Nickerson* v. *Tirrell*, 127 Mass. 236; *The John A. Berkman*, 6 FED. REP. 535. In *Sawyer* v. *Oakman*, 7 Blatchf. 290, the owner of a wharf was held bound to notify the master of a vessel, which was about to haul into the wharf, as to the condition of the bottom where the vessel would ground at the fall of the tide, and was held liable in damages for injuries to the vessel caused by unequalities in the bottom, due care having been exercised by the vessel.

When the respondents purchased the property, as before stated, it had been used as a ship-yard, and a marine railway extended from

the shore down into the bed of the river. When the grantees removed from the premises the buildings and other improvements reserved by the conveyance, they left standing above and below the water the pilings which had supported the railway. The respondents put up a bulk-head in front of the dock, partially filled in the same, and covered up the pilings where the filling in was done, but did not disturb those outside the bulk-head in the bed of the river. Mr. Atha excuses himself for leaving them by saying he did not know they were there. But he made no inquiry, and took no steps to ascertain whether they were there or not. I think it was negligence for not doing so on completing his wharf for use, and, being aware of the existence of the railway, he owed it to the public to remove, or at least to attempt to remove, the obstructions left by the former owners. From the large number of pilings afterwards taken out by Van Ness it is manifest that a little inquiry would have given him knowledge of the obstructions to the navigation, and of the perils to the use of t. wharf, which had been left in front of the dock. Holding that the omission of such inquiry was negligence, there must be a decree for the libelant, and a reference to ascertain the damages.