CONKLIN et al. v. R. P. & J. H. STAATS CO.

(District Court, D. New Jersey. July 24, 1907.)

WHARVES—NEGLIGENCE—INJURY OF SCOW AT PIER—SUNKEN PILE.

Respondent, as contractor, was constructing the piers of a steamship company at Hoboken to replace others which had burned and had contracted with libelant to furnish crushed stone delivered on scows. It had removed all stubs of piers extending above low water, and an independent contractor had dredged the botton under and alongside the old piers to a depth of 25 feet, and removed all other stubs found, and had also taken proper measures to ascertain that none remained. By agreement libelant left five scows loaded with stone which was to be used by respondent as required during the winter. Respondent caused one of such scows to be moved from one side of a slip to the other, and there made fast to the pier to which others of the scows were also tied up. A very strong wind blowing from the west for two days caused an extraordinary fall of the tide, and as she settled such scow was pierced by an unknown sunken pile, and capsized and injured. The pile or stub appeared to be an old one, but the span alongside the pier had been used by other vessels during the work with safety, and it was shown that respondent had dragged the bottom to discover any obstruction. Held, that conceding that respondent owed the duty of reasonable care to protect the vessel, as bailee or otherwise, such care had been exercised, and that no negligence or fault was shown which rendered it liable for the injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Wharves, §§ 36, 37.]

In Admiralty.

Walter L. McDermott, for libelants.

J. D. Beedle and R. S. Hudspeth, for respondent.

CROSS, District Judge. The libel in this case was filed for the purpose of recovering damages for injuries to the scow Sarah while used for carrying crushed stone, also for the loss of her furniture, tackle, cargo, etc. The respondent is a New Jersey corporation, and at the time of the injury to the scow was engaged in building docks and piers for the North German Lloyd Steamship Company, on the Hudson river at Hoboken, to replace docks and piers which had been destroyed by fire. The contract involved work of great extent and importance, and which, although commenced in 1900, was not completed and turned over to the steamship company until 1906. A fire had destroyed all the superstructure of the old piers, but had left the stumps

of a large number of piles standing in the river bed, and the first work of reconstruction required the removal of these old and partially burnt piles. This work, in so far as it embraced the removal of the piles which showed above low water, was done by the respondent. Then the necessary dredging followed, which, when completed, was of a depth of 30 feet below low water, but at the time of the accident was of a depth of 25 feet only. That work, however, was not performed by the respondent, but by an independent contractor. When the respondent had pulled all of the piles which showed above low water from the whole or a portion of an old pier site, the dredging was begun over the area thus cleared, during which operation any piles found below low water were removed by the dredgers as a necessary incident to the continuance of their work. The dredging, when completed, embraced the entire sites of the old piers and slips, but at the time of the accident extended only to the former pier sites and a margin of 25 to 40 feet or more on either side thereof. There is some conflict in the testimony as to when this preliminary dredging was completed, but I think it sufficiently appears that it was substantially finished during the year 1901. Some work of that character, however, was performed during the entire period of construction. The piers were from 800 to 950 feet long, and the slip in which the accident occurred was 250 feet wide.

A contractual relationship existed between the parties to this suit, which was established in the following manner, and for the following purposes: In January, 1901, the Rockland Lake Trap Rock Company, which is shown to have been the selling agent of the libelants, opened negotiations with the respondent for the delivery of crushed stone at the piers, to be used in their construction. These negotiations were carried on by the Rockland Lake Trap Rock Company, as agent for the libelant. On January 31, 1901, the Staats Company accepted the proposal of the libelant to furnish 20,000 cubic yards of broken trap rock, to be delivered f. o. b. scows at their work at Hoboken, N. J. More definite information, however, was to be given later as to the time when the stone would be required. Pursuant to this contract, stone was delivered during the following season and until navigation was about to close in the fall of 1901. The respondent, requiring some stone for its use during the winter season, communicated with libelant by a letter dated December 13, 1901, in which it requested that 3,000 cubic yards of stone should be delivered to them before navigation closed, and that the scows laden with the stone should remain in Hoboken during the winter months. This proposal was accepted. The respondent's letter making the request contained the following paragraph:

"Confirming our conversation to-day with reference to the delivery to us of several scow loads of broken stone for use in our work at Hoboken during the winter, we understand that you will send us five scow loads of such stone, containing about 3,000 cubic yards in all, and will deliver the same alongside the North German Lloyd docks at Hoboken, within the next few days, allowing them to remain there during the winter months. Also that we may use the stone from these scows as occasion requires without charge for demurrage to us until such time as a scow is taken from the lot for our use, and demurrage shall only accrue on that scow after sufficient time has elapsed in

which to unload the scow at a minimum rate of 75 yards per day (Sundays and holidays excepted). The scows while lying in the slip to be solely at your risk, and you will provide such men as may be needed to look after them, and when a scow shall have been unloaded by us you will remove it from the premises."

Pursuant to this arrangement, the scow Sarah, laden with crushed stone, was towed to Hoboken, N. J., and tied up on the north side of Pier No. 2, December 29, 1901. Her tie up at that point was made pursuant to a telephone message received by the libelant from respondent's office. The scow, still laden with the stone, lay at this mooring until January 3, 1902, on the evening of which day a tugboat The Castor, belonging to the North German Lloyd Steamship Company, took her in tow, and conveyed her over and across the slip between piers 1 and 2 to the south side of pier No. 1, about 150 feet from its end, and directly opposite the point at which it lay while at pier 2. Two other scows of libelant were already tied to the south side of pier 1, but at points nearer the bulkhead line. The removal of the Sarah was made by the tug at the instance of the respondent. The scow had a draft of 10 feet. She was two years old, in good condition, and in charge of a captain, so called, although he was little more that a caretaker, since the scow was without any means of self-propulsion. The scow was moored on the south side of pier 1, breast off five feet, and was tied with two breast and two spring lines. The tide was ebbing rapidly, aided by a strong westerly wind which had been blowing for two days, and which had caused the tide at the time of the accident to fall from 18 inches to 2 feet lower than usual. After the scow had laid at her new mooring about three-quarters of an hour, she began to list away from the pier. Her captain sounded the water around her with a 16-foot pole to see if the water were shallow, but he found no bottom. He then went down into the hold, and heard water beginning to trickle slowly in. While he waited on the scow, a pile broke through her bottom, and she careened over gradually to the port side. He then went up the pier to look for help, and, when he came back a few minutes after, the scow lay bottom up with one corner on the pier, and the other in the water. He tried to ease up the lines to see if she would slide off, but she did not. While she lay there, the watchman says he saw a jagged hole in her bottom 16 or 17 inches wide by about 2 feet in length. The hole was about one-third of her length from the bow, and about two feet from her starboard side, which had lain next to the pier. Subsequent examination of the scow at a dry dock to which she was taken for repairs showed that the injury to her was in all probability caused by her bottom coming in contact with a sunken pile, which, owing to the weight of her load, was forced through and rammed up in her hold as far as it could go, about nine feet, and then, when the scow capsized by the spilling of its load, was broken off and a piece thereof, about eight feet in length, left in her hold in a reclining position between the stanchions and cross-pieces. The portion of the pile found in the scow was a little less than 15 inches in diameter, about 9 feet long, and was in good condition, although it had a few barnacles on it. At one end appeared what is called a "battered break," as though a heavy weight had rested

on it. This break had an old appearance, while at the other end was a new and longer break. It is apparent from the evidence that the accident happened by reason of the fact that the scow had been moored over a hidden pile; but how or when the pile came there is not disclosed. The important question for consideration therefore is whether the respondent was negligent in the premises. The case was tried in the Supreme Court of New Jersey, before the late Judge Dixon, who granted a nonsuit. His action in that respect was subsequently reviewed by the Court of Errors and Appeals on writ of error, and affirmed. Conklin et al. v. R. P. & J. H. Staats Co., 70 N. J. Law 771, 59 Atl. 144. The court, among other things, held in that case that no negligence on the part of the defendant had been shown. Of course, that judgment is not controlling here, since the evidence now presented is not altogether the same as that presented in the state court. However, certain legal propositions were there adjudged which may be of service at the present time.

The question has been raised whether the respondent, if liable, is liable as bailee or under the law of invitation. The libelant has suggested that the scow was in law turned over to the respondent as bailee when at its suggestion she was taken by the tug and shifted from one pier to the other. That the respondent was not a wharfinger within the strict signification of that term does not seem to require serious discussion. Such a person has been defined as one who maintains for hire a wharf for the purpose of accommodating vessels in the loading and unloading of freight, or the receipt and landing of passengers. This definition, while not complete, answers the present purpose. There are no facts disclosed which would warrant a finding that the respondent occupied any such position; but it is quite unnecessary to determine in which of the above relations the respondent stood toward the libelant, since, as was decided in the state court, his duty and responsibility in either capacity would be the same. The respondent in any case was not an insurer of the safety of the scow, nor, if liable, is it so merely because of the happening of the accident, but rather because it failed to exercise reasonable and ordinary care and prudence in the discharge of some duty which it owed to the libelant. Where reasonable care is employed in doing an act which is not in itself illegal or inherently likely to produce damage to others, there will be no liability, although damage, in fact, ensues. The exercise of reasonable care does not require the adoption of such precautions as will absolutely prevent accident and injury. As was said by Chief Justice Beasley in Marshall v. Welwood, 38 N. J. Law, 339, 343, 20 Am. Dec. 394:

"No man is in law an insurer that the act which he does, such acts being lawful and done with care, shall not injuriously affect others."

And, again, on page 345 of 38 N. J. Law (20 Am. Dec. 394):

"Everywhere in all the branches of the law the general principle that blame must be imputable as a ground of responsibility for damage proceeding from a lawful act is apparent."

The principle of law just enunciated is elemental, and the extracts given are only warranted because of the clarity and conciseness with which the principle is stated. Nor again does the exercise of ordinary

and reasonable care require the adoption of every precaution, and the exercise of every known means to prevent injury or accident, but only of such precautions and means as a reasonably prudent and careful person would, under the existing circumstances, adopt and use. As applicable to wharfingers the degree of care required will be found laid down in Smith v. Burnett, 173 U. S. 430, 433, 19 Sup. Ct. 442, 443 (43 L. Ed. 756); where the Chief Justice, speaking for the court says:

"Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to remove it or to give due notice of its existence to vessels about to use the berths, at the same time the master is bound to use ordinary care, and cannot carelessly run into danger." (Citing cases.)

This principle seems to apply in all cases where docks or wharves are in the possession and under the control of owners, lessees, or occupants. It is a universal rule that where a source of danger is known to one in control of a wharf or dock, and he fails to take means to obviate or remove it, or to warn a person about to use the dock or wharf of the hidden danger, he is responsible. It requires no argument to show the reasonableness of the principle just stated. But the liability of an owner, lessee, or other person in control of a wharf does not stop there. The rule is broader and extends his liability to hidden dangers of which he had neither notice nor knowledge, but of which by the exercise of reasonable care and diligence he might or should have known. Among the numerous cases which support this broader proposition the following may be mentioned: Nickerson et al. v. Tirrell, 127 Mass. 236; The John A. Berkman (D. C.) 6 Fed. 535; Manhattan Transportation Co. v. Mayor, etc. (D. C.) 37 Fed. 160; The Annie R. Lewis (D. C.) 50 Fed. 558; Onderdonk v. Smith et al. (D. C.) 21 Fed. 588; Penn. R. R. Co. v. Atha, (D. C.) 22 Fed. 920; The Nellie (D. C.) 130 Fed. 213; Philadelphia & R. Ry. Co. v. Walker (D. C.) 139 Fed. 855. This is the general rule, and I do not think any case can be found which establishes any broader liability under circumstances such as are here disclosed. There is no pretense or claim that the respondent had actual knowledge or notice of any danger, hidden or exposed, at or near the point where the scow Sarah was moored, so that the only question for determination is whether it exercised reasonable care and prudence in the premises. As already stated, it matters little what specific relationship the respondent sustained toward the libelant, and, in the further consideration of this case, I shall assume that the respondent owed a duty to the libelant to exercise reasonable care and prudence to see that the place in question was free from danger, notwithstanding the state court, in the suit above referred to, held that no such duty existed, and I shall also assume that the respondent was not absolved from liability for any accident to the scow by reason of anything contained in the letter of December 13th, above quoted.

In my opinion the evidence does not show that the respondent was negligent, admitting that it owed a duty to the libelant. Prior to the accident all of the old and burnt piles which extended above low water had been removed. Furthermore, after this was done, the site of the old piers and waters adjacent thereto were dredged, so that there was

a depth of 25 feet of clear water at low tide. This dredging included the slip between the piers, and in the use of the dredge, whenever an old or sunken pile was struck, it was removed. The dredging in and of itself, from the manner in which it was conducted, would seem to have necessarily disclosed any hidden obstruction of the character which apparently caused the accident in question. The cut made by the dredge was also sounded and tested from time to time, as hereinafter indicated. Furthermore, it appears that clusters or groups of piles were driven in the mud from the ends of the piers back to the bulkhead in a line parallel with and 60 feet from the piers, so that between the groups of piles and the pier was a clear waterway of about 60 feet in width and that a waterway of that width and character existed on the south side of pier 1 at the time of the accident. The testimony shows that these clusters or groups of piles were driven for the protection of the piers during construction, so that, when vessels approached the piers for whatever purpose, they would have to come through this waterway, and be warped in and through it to any desired point along the pier. It has already been remarked that two of the respondent's scows had been warped in and along the south side of pier 1, in the manner above stated, and at the time of the accident to the Sarah were tied to that side of pier 1, but nearer to the bulkhead than where the Sarah was subsequently tied. The dredging was not done by the respondent, but was done by a company known as the "Dubois Company," under the direction of the engineer of the North German Lloyd Steamship Company, and the dredging company determined that the water was clear by means of a sinker and line, and also by means of a pipe with a rope at each end fastened to boats and dragged along below the surface of the water. The testimony on behalf of the dredging company is that there were no obstructions in the water or mud after the dredges went over, and that there was nothing left there, that by the method of dredging adopted they could surely have detected whether or not any obstruction remained, and, although the evidence shows that this was not the only means of ascertaining that the bottom of the river was free from obstruction, one of the witnesses swears that no other test was needed. It also appears that, before the respondents started to drive piles for the purpose of building thereon the substructure of the new piers, they hung a rod down from two boats which was dragged through the water to see if it met any obstruction, that this bar was lowered in the water from 10 to 15 feet, and that the water was free from obstruction to that grade. Again, after the removal of the piles, and after the dredging had been completed, and after the substructure of the piers had been built, it appears that vessels of various kinds, such as two and four masted schooners, lighters, barges, mud scows, and piledrivers, some of them loaded with timber, stone, and granite, had frequently been warped into the waterway between the clustered piles and the south side of pier 1; that this was done at all stages of the tide; and that no obstructions had been discovered at the point of the accident. It seems to me that all was done in this case that ordinary care and prudence required. It should be remembered in this connection that the Sarah was not anchored at an old and established pier,

but that there and elsewhere in the vicinity new construction was and had been in progress for some time. The facts in my judgment would justify a conclusion that extraordinary care was used, rather than a finding that ordinary care was not used. It is possible that something more might have been done, but I do not think it was necessary in order to exonerate the respondent from liability. As reasonably prudent and careful men, the respondents were justified in believing that the water at the point in question was free from dangerous obstruction; they were not put upon inquiry, and no sufficient circumstances existed to put them upon inquiry. The counsel of the libelant in his brief says, "The presence of the pile is the best evidence that the respondent did not use due care"; but in this statement he is clearly wrong. The only question is: Did the respondent exercise due care to discover the pile? If it did, it is absolved from liability, notwithstanding its efforts in that direction failed. There is another view of the case, however, which might reasonably be taken, and that is that the accident happened because of an unusually low tide. Ordinary care only requires reasonable protection against ordinary dangers, such dangers as might naturally be expected to exist. The tide at the time of this accident, by reason of the very strong and exceptional wind which had been blowing for two days, was undeniably from 18 inches to 2 feet lower than usual. The testimony shows that it was an extraordinarily low tide, and, if the accident occurred by reason of a submerged pile, which under all ordinary conditions of wind and tide would have been harmless, it must be attributed, I think, to the unusual conditions then existing, rather than to the failure of the respondent to exercise such care as would anticipate and provide against the unexpected. Whether such an unusual condition had ever prevailed before in the experience of the parties the evidence does not disclose, but, if it had, doubtless a greater degree of care would have been imposed on the respondent. Furthermore, there is evidence tending to show that the pile which caused the injury might have drifted to the place where the accident happened, and have become caught and partially imbedded in the mud, which was soft and deep at that point, and, while in this position, have come in contact with the bottom of the scow, but in the view I have taken of the case it is unnecessary to consider that testimony at length.

The libel will be dismissed with costs.