### BERTINO et al. v. MARION STEAM SHOVEL CO.

### No. 9541.

Circuit Court of Appeals, Eighth Circuit.
March 22, 1933.

Clay C. Rogers, of Kansas City, Mo. (O. C. Mosman, Paul A. Buzard, Louis N. Wolf, and Cornelius Murphy, Jr., all of Kansas City Mo., and Sylvan Bruner, of Pittsburg, Kan., on the brief), for appellants.

Elliott H. Jones, of Kansas City, Mo. (J. M. Strelitz, W. C. Scarritt, Edward S. North, and A. D. Scarritt, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, VAN VALKEN-BURGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is an appeal from a judgment dismissing "on the merits and with prejudice" at the close of plaintiffs' testimony an action brought by appellants under the Missouri Workmen's Compensation Act (Revised Statutes of Missouri, 1929, § 3299 et seq. [Mo. St. Ann. § 3299 et seq.]) to recover damages arising from personal injuries received by appellant Bertino.

The action was originally commenced in the state Circuit Court of Jackson county, Mo., but was removed on the ground of diversity of citizenship.

Facts about which there is no substantial dispute are as follows: The Alston Coal Company was engaged in operating a strip pit coal mine. It had agreed to purchase a large electric shovel from the defendant, Marion Steam Shovel Company. A written contract between the Alston Coal Company and the Marion Steam Shovel Company covering the purchase was identified by the witness Klaner, who was the president of the Alston Coal Company; was attached to his deposi-

tion; and was received in evidence over the objection of the plaintiffs. The contract, so far as here material, is set out in the margin.[1]

"This Agreement, Signed at Chicago, Illinois the 20th day of September, 1928, by the Alston Coal Company, Buyer, a Corporation of Kansas with principal place of business located at 205 Globe Building, Pittsburg, Kansas, in the County of Crawford in said State, and by the Marion Steam Shovel Company, Seller, a corporation of Marion, Ohio, witnesseth:

"Seller agrees to deliver to Buyer, F. O. B. Marion, Ohio, on or about ——. See below —— unless prevented by war, war measures, strikes, fires, failure or delay of other manufacturers in furnishing parts for this order which Seller is required to purchase from other manufacturers, delays of sub-contractors, accidents and delays of carriers and other unforeseen contingencies or unavoidable occurrences, the following property, to-wit:

"One Type 350 Electric Shovel Complete mounted on crawling traction trucks and equipped with 90 ft. boom, 58 ft. dipper handle and 8 cu. yd. manganese front dipper fitted with manganese steel teeth. Electrical equipment to be full Ward Leonard Control, primary power supply 3 phase, 60 cycles, 4000 volts. All as per specification No. H. K. 355, attached hereto.

"First Shipment—On or about Dec. 1, 1928 "Final Shipment—On or about Jan. 10, 1929 * * *

"Seller agrees at any time within thirty days after arrival at destination of said machine and equipment, upon Buyer's written request, to transfer within a reasonable time to Buyer for a period of —— consecutive days the services of one skilled man to supervise, as employee of the Buyer, the erecting and starting of said machine; failure to request the services of said skilled man shall constitute an acceptance by the Buyer of said machine and equipment, and a waiver of any warranty, express or implied, with reference thereto.

"Subject to the provisions of the paragraph next preceding, Seller guarantees the within described machine or machinery manufactured by it to be free from defects in material and workmanship under normal use and service, its obligation under this warranty being limited to making good at its factory any part or parts thereof which shall within ninety days after delivery of said machine to the original purchaser, be returned to it with transportation charges prepaid, and which its examination shall disclose to its satisfaction to have been thus defective; this warranty, being expressly in lieu of all other warranties, expressed or implied, and of all other obligations or liabilities on Seller's part. * * *

"It is agreed that the above specified property shall be and remain the property and subject to the order of Seller until paid for in full, and Buyer agrees to execute when requested by Seller any instrument Seller may deem necessary for its protection under the laws of the State where said property is to be located, providing the payments due thereunder are the same as those herein provided for; it is agreed that all notes given hereunder, or any renewals of the same, shall be considered as evidence of the sum due on this Contract, and not payments, and shall be collateral to this Contract, and the giving of the same, or the renewal of the same, or any part payment thereof, shall not divert the title of Seller until the purchase money is paid in full; nor shall any payment on account, and the receipt thereof, divert the title until the whole purchase price is paid in full. * * *

"It. is further agreed, that this instrument evidences the whole agreement of said parties, and it cannot be changed, modified or supplemented by any agent or other person except in writing, approved in writing, by Seller at its Home Office at Marion, Ohio.

The provisions of said contract which are here directly involved read as follows:

"Seller agrees at any time within thirty days after arrival at destination of said machine and equipment, upon Buyer's written request, to transfer within a reasonable time to Buyer for a period of —— consecutive days the services of one skilled man to supervise, *as employe of the Buyer*, the erecting and starting of said machine; failure to request the services of said skilled man shall constitute an acceptance by the Buyer of said machine and equipment, and a waiver of any warranty, express or implied, with reference thereto. (Italics ours.) * * *

"In addition to the erector furnished by the Seller to supervise the erecting and starting of shovel, Seller agrees to furnish an Electrician to supervise the installation of the electrical equipment, without charge to buyer."

The contract provided that the title to the shovel should remain in the seller until the purchase price had been paid in full. The shovel was sold in a "knock-down" condition.

The erection of the shovel occupied about three months, and was under the direction of one, Ed Titus, who was a regular employee of defendant, and was sent for the purpose pursuant to the contract.

Two electricians, employees of the defendant, were also at work on the job at the time of the accident. One of them, Hines, had been regularly assigned to the job by defendant; the other, Williams, was not regularly

"To render this contract binding upon The Marion Steam Shovel Company it must be approved by an officer of said Seller, and its acceptance by any other agent of the Seller is subject to such approval.

The Marion Steam Shovel Company
By Harry T. Gracely, Salesman
The Alston Coal Company
J. F. Klaner, President

(Reverse side of Page 1)
"Seller agrees to furnish without charge to the buyer the usual set of erection tools including derrick but less air compressor, Buyer to pay freight and transportation charges both ways from Marion, Ohio, and return.

"In addition to the erector furnished by the Seller to supervise the erecting and starting of shovel, Seller agrees to furnish an Electrician to supervise the installation of the electrical equipment, without charge to buyer.

"Seller guarantees to securely hold in place the circular racking on the lower frame during the life of the racking.

"In case any part of this shovel through continued failure, normal wear and tear excepted, shows it is too weak to perform the normal function for which it was intended, Seller agrees, within a reasonable time after being notified, to correct same at its expense. Seller's liability or obligation under this warranty expires Dec. 31, 1933. This clause is not meant or intended to set aside or modify Seller's standard warranty expressed in the second paragraph of Page 2 of this contract."

assigned to the job. His presence there and his status is explained by the following testimony:

"Q. Now were you asked or assigned by the Marion Steam Shovel Company to work at all on the Alston Coal Company 350 shovel here in question? A. No, only in a general way. Whenever I am in the vicinity where we have equipment I always go and check the equipment over; that is routine work.

"Q. I mean, were you assigned to work in the matter? A. No, sir, I was not.

"Q. You were simply out there, as I understand, looking over this new shovel and sort of checking it up? A. Yes, sir. Mr. Hines was the electrician who was assigned to install and operate the equipment, and I was there only two or three days looking it over and watching the operation of it. I was operating it at the time of the accident. I was just temporarily relieving Mr. Hines. At the time to the best of my knowledge, he was getting some floodlights ready to install on the machine in a little shed back of the machine.

"Q. And did you operate it just for the moment there at the request of Mr. Hines or Mr. Titus? A. Oh, for probably an hour or so. I just volunteered, nobody asked me that I know of. I think Mr. Titus consulted me about the matter of raising the dipper to put it into position. He told me that he was going to do it. I operated the mechanism to raise the dipper from signals given by Mr. Titus. * * * I know nothing of my own personal knowledge of the Alston job. I had not been assigned by the company at all to work on the erection, but I was out there looking around and when Mr. Hines was off looking after something else, I volunteered to substitute and help him, and whatever I did was under the supervision and direction of Mr. Titus.

"Redirect Examination.

"Q. Mr. Williams, you said on cross-examination that you were assigned to this work only in a general way, did not not? A. Yes.

"Q. Now you said something about going, when you are in the vicinity you go to other work and look it over? A. Yes, sir.

"Q. And make an inspection of it? A. Yes, sir.

"Q. That is a part of your duty? A. That is routine work, yes, sir.

"Recross Examination.

"Q. When you speak of doing that checking over in a general way, was it a part of your duty or were you assigned to work on the job at all? A. No, I was not."

The labor, except the supervision of the erection of the shovel and the installation of the electrical equipment and the actual operation of the equipment, was being done by the Alston Coal Company through its employees under the supervision of Titus.

On the date of the accident, Titus and the men under him were attempting to connect the dipper of the shovel to a mechanical device known as the dipper stick, and in doing this were raising, hoisting, and swinging the dipper by means of a chain attached to a hoist. This chain was the property of the defendant and was a seven-eighths inch chain, there being only one strand of the chain to carry the weight of the dipper. It was necessary to turn the dipper after it had been raised from the ground, and for that purpose Titus directed Bertino and the other men to take hold of the dipper and swing it around after it had been raised. Titus then took a piece of timber and unlatched or opened the door of the dipper, which permitted the end of the door to fall to the ground. In that position the men could not swing the dipper, so Titus ordered the engineer to hoist the dipper further, and at the same time told the men to take hold of it so as to line it up with the stick, which meant to twist it around when it was raised high enough to be clear of the ground. Pursuant to Titus' orders, plaintiff Bertino took hold of the dipper and was pushing on it when Titus gave the electrician another signal to raise it, and the electrician "jerked" the load, causing Bertino's hand to slip in between the dipper and the door, at which time the chain broke, causing the dipper to drop, and plaintiff's hand was caught between the dipper and the dipper door. It was severely mangled, and amputation was necessary.

At the time when Bertino saw that the chain was to be used to hoist the heavy dipper, he asked Titus if he was not going to use a cable to lift it; and Titus said, "No, that chain has lifted many a dipper up." Then Bertino asked him if he was going to take the door off the dipper, the door weighing about two tons. Titus said that it was safe.

Plaintiffs contend that defendant was negligent in using a chain instead of a cable for the purpose of raising the dipper; that it was negligent in raising the dipper with the door open; that it should not have attached the door until after the dipper was fastened to the dipper stick; that it was negligent in suddenly jerking the dipper while

Bertino was pushing it; and that it was negligent in not warning Bertino of the danger of the chain's breaking.

Issues were raised in the court below whether there was not a defect of parties plaintiff; also whether there was not a misjoinder of causes of action. These issues were not passed upon directly by the trial court and are not pressed on this appeal. See, however, Ætna Life Ins. Co. v. Moses, 53 S. Ct. 231, 77 L. Ed. ——; General Box Co. v. Missouri Utilities Co. (Mo. Sup.) 55 S. W.(2d) 442.

Nor is it contended on this appeal that the question of negligence under the evidence was not for the jury.

The crucial question decided by the trial court and presented on this appeal is whether, in view of the provisions of the contract (above quoted) between the coal company and the defendant shovel company, it can be said that it conclusively appears that Titus was at the time of the accident an employee of the coal company, and that this conclusion is binding upon the plaintiffs.

The trial court held in the affirmative, and dismissed the action with prejudice.

■ We find no fault with the holding that the status of Titus, as between the parties to the contract, was fixed as an employee of the coal company. The language of the contract was plain, and such contracts may be valid. Sun Oil Co. v. Dalzell Towing Co., Inc., 287 U. S. 291, 53 S. Ct. 135, 77 L. Ed. ——.

But the plaintiffs were not parties to the contract, and its terms were not binding upon them. As to them, the status of Titus must be determined by consideration of other matters than the contract between the coal company and the shovel company.

Where an employee of one company is loaned temporarily to another company, the question whether the person loaned (so far as concerns employees of the borrowing company) remains an employee of the lending company or becomes an employee of the borrowing company is not always easy of solution. Helpful tests have, however, been laid down by the courts.

In Standard Oil Company v. Anderson, 212 U. S. 215, page 221, 29 S. Ct. 252, 254, 53 L. Ed. 480, the Supreme Court, in discussing the principles applicable to such cases, used the following language: "It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."

And further (page 225 of 212 U. S., 29 S. Ct. 252, 255): "In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining *whose is the work* and *whose is the power of control.*" (Italics ours.)

In Yelloway v. Hawkins, 38 F.(2d) 731, this court, speaking by Judge Van Valkenburgh relative to a similar question, said (p. 735):

"The ground upon which a master is held liable for the negligent acts of his servant is because the servant is engaged in the master's affairs, for the proper conduct of which the master is responsible. 'The mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant.' Driscoll v. Towle, 181 Mass. 416, 63 N. E. 922.

"The test is whether the servant is engaged in the work of the new master, who has particular 'power to direct and control the

manner of performing the very work in which the carelessness occurred.'" (Citing numerous cases.)

In Rutkowski v. J. I. Case Threshing Machine Co., 126 Kan. 627, 270 P. 599, the defendant company, a dealer in farm machinery, sold a harvester thresher to plaintiff through a local dealer, Stoehr. Nothing was said in the order about setting up the machine, but it was the practice of defendant to furnish an expert for that purpose. Defendant sent an expert machinist, Cobb, to set up the machine. Through his negligence, plaintiff was injured. It was held that Cobb was the servant of defendant company and not of Stoehr. The court in its opinion said (page 630 of 126 Kan., 270 P. 599, 601): "But the evidence does not show that Cobb was loaned to Stoehr or that he was hired to him. Stoehr did not have control of the operation and had no authority to direct the kind of work to be done by Cobb. Nor did Cobb look to Stoehr for direction as to the manner of doing the work assigned to him, but rather he was directed to take charge of the work and fulfill the obligation assumed by the defendant of setting up the machine. Cobb was not only selected and employed by the defendant for this work, but it was done in furtherance of its business."

From the foregoing cases and from many others, it is apparent that the two main tests to be made in determining the crucial question in the case at bar are: (1) Whose work was being done by Titus; (2) under whose control was Titus at the time.

From the provisions of the contract between the two companies, it clearly may be argued that the shovel company was carrying out one of its own obligations in furnishing Titus to superintend the erection and starting of the shovel; and that by performing this obligation upon request, the shovel company was making definite and certain the terms of its guarantee of the machine; in other words, that the work being done was that of the shovel company.

Whether Titus was under the control of the shovel company and not of the coal company is also clearly an open question of fact. He was in the general employ of the shovel company. He received his pay from the shovel company. The correspondence offered, but not received, in evidence between the two companies relative to the conduct of Titus had a direct bearing upon the question where the control of Titus rested.

In view of the evidence in the case at bar, we think that it cannot be held as a matter of law that Titus was an employee of the coal company, and that the status was binding upon plaintiffs.

The further question whether Williams was at the time of the accident an employee of the defendant company was also involved in the case. Inasmuch, however, as this question was not brought sharply to the attention of the trial court, we pretermit discussion of it, and content ourselves with saying that the same tests are applicable as in the case of Titus.

What we have already said shows that, in our opinion, the letters offered by plaintiffs as Exhibits 1, 2, and 3 (but not received), as well as the contract between the coal company and the defendant company, which was received, were all admissible in evidence in view of the tests above discussed.

Our conclusion is that the judgment should be reversed and the cause remanded for a new trial.

It is so ordered.