**HENRY W. CROSS CO. v. BURNS.**
No. 10360.

Circuit Court of Appeals, Eighth Circuit.
Feb. 3, 1936.

Rehearing Denied March 13, 1936.

Neill C. Marsh, Sr., and Charles E. Wright, both of El Dorado, Ark. (Neill C. Marsh, Jr., Joe K. Mahony, and Henry S. Yocum, all of El Dorado, Ark., on the brief), for appellant.

Robert C. Knox, of El Dorado, Ark. (S. E. Gilliam, of El Dorado, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an action brought by appellee as administratrix of the estate of R. C. Burns, deceased, against the appellant, for damages for negligently causing the death of her husband, R. C. Burns. We shall refer to the parties as they appeared below.

It is alleged in the complaint that the defendant, at the times mentioned in the complaint, was engaged in the operation of a refinery at Smackover, Ark.; that plaintiff's intestate was employed as refinery superintendent by the Simms Oil Company, and that one C. L. Murphy was employed as refinery superintendent for the defendant, and was in charge and control of defendant's refinery plant at Smackover; that on July 13, 1933, plaintiff's intestate was invited by C. L. Murphy to come to the plant of defendant to consult and advise with him about certain refinery operations and constructions at defendant's plant, and while there as such invitee he was injured, and after suffering conscious, mental, and physical pain and anguish, died as a result of said injuries on account of an explosion and fire which occurred and took place by reason of the carelessness and negligence of the defendant, and of the carelessness and negligence of C. L. Murphy. The complaint describes certain of the appliances and machinery with which defendant's plant was at the time equipped, and alleges that Burns, plaintiff's intestate, being present at the invitation of C. L. Murphy, was being conducted through the plant by Murphy, and that by reason of the negligence of Murphy and other employees of the defendant, a certain caustic tank containing naphtha was caused to be exploded, bursting the tank, and throwing the naphtha therein to such distance as to bring it and its vapors in contact with fire and flames used in the operation of the refinery, so that the naphtha became ignited, causing fire immediately to spread throughout the refinery, enveloping Burns in flames and severely burning him, the said injuries resulting in his death; that the plant was under the exclusive management and control of the defendant, its agents, servants, and employees, and under the specific immediate control and management of Mr. Murphy, who was the superintendent in charge; that the explosion and igniting of the naphtha was a rare and unusual occurrence in the operation of a refinery, which Burns could not have foreseen; and that he was in the exercise of due care for his safety at the time of receiving his injuries. Specific acts of negligence are alleged, which, so far as relied upon, may be summarized as follows: (1) That the caustic tank, which exploded, had been constructed from an old worn out and defective secondhand tank purchased from a junk dealer, was full of holes through which the gasoline or naphtha leaked, had been patched by defective welding, the shell of said tank had been improperly and defectively welded to the bottom, so that naphtha leaked therefrom, and it was greatly weakened and insufficient to withstand pressure by reason of the defective and improper welding, so that it exploded and threw naphtha into the refinery area where it ignited; (2) the caustic tank was constructed and operated without any pressure gauge and without any pressure relief valve; (3) the outlet valve of the caustic tank was closed, permitting a high pressure to be built up in that tank and causing it to explode; (4) the valves on the line from the treating unit to the storage tanks were closed, permitting pressure to be built up in the caustic tank, and causing it to explode; (5) a death trap was created by the placing of large numbers of pipes and lines above the surface of the ground, running at various angles and crossing and intersecting one another at various points, by which plaintiff's intestate was prevented from escaping from the flames which resulted from the explosion and ignition of the naphtha; (6) that a highly hazardous and dangerous situation existed in said plant and plant area, of which defendant knew and was charged with knowledge, yet it invited Burns to come to the plant, and conducted him through the plant, and failed to warn and inform him thereof.

Defendant, in its answer, denied all allegations of negligence, particularly denied that Burns was an invitee, and alleged that he was a trespasser. It set up as an affirmative defense contributory negligence, and that if Burns died of negligence other than his own, it was the negligence of the Ampco Engineering Company, an independent contractor.

At the close of all the evidence defendant moved for a directed verdict. This

motion was denied, and the case went to the jury, which returned a verdict for plaintiff, and from the judgment entered thereon this appeal is prosecuted.

Defendant seeks reversal on the grounds that: (1) The trial court erred in not directing a verdict for defendant; (2) there was no substantial evidence that any negligence of the defendant was the proximate cause of Burns' death; (3) if any negligence was the proximate cause of Burns' death, it was the negligence of Ampco Engineering Company, under whose full control the installation complained of as the cause of. Burns' death was installed and operated as an independent contractor; (4) the court erred in refusing to amplify the instructions relative to the status of the Ampco Engineering Company as an independent contractor.

In considering the question of the alleged error of the lower court in refusing to direct a verdict in favor of defendant, it will be necessary to refer to the evidence. As to all controverted facts we must assume that the jury determined them in favor of plaintiff, and we must view the evidence in favor of plaintiff's cause of action in the most favorable light, giving to it such favorable inferences as may reasonably be drawn therefrom. So viewed, the evidence tended to show that Murphy, who was the superintendent in charge of defendant's plant, was experiencing some difficulty with that part of the plant referred to as the cracking unit. Burns was a skilled refining engineer of long experience, who was in charge of a similar plant of the Simms Oil Company. This cracking unit had but recently been installed, and Murphy was not familiar with it, nor had any of defendant's employees had experience with either the construction or operation of such unit. It had theretofore operated what is known in the record as a skimming plant. Murphy telephoned to Burns, first at Burns' residence. Burns and Murphy having both perished in the explosion, there was no direct testimony as to the nature of the telephone communication. Following this first telephone call, Burns went to the Simms Refinery. About an hour later, Murphy again called for him, and to a Mr. Williamson, who answered the phone, Murphy said he wanted to get hold of Burns; that they were having a little trouble. Burns appeared at the office about that time, and, taking the phone, talked to Murphy. Following this second call, Burns, with a party named Soars, left for defendant's office. Arriving there, they waited on the outside until Murphy appeared. Murphy then entered the plant, taking Burns and Soars with him. They passed on down through the boiler room, where Murphy, in charge of the party, introduced Soars to a Mr. Lechtenburg, then employed at defendant's plant. Murphy then said that they were going down to see what was wrong with the "cracker," referring to the cracking plant. They then left the boiler room, passed down to the area of the treating plant, and were inside the plant area when the explosion occurred.

There is evidence that Murphy often sought Burns' opinion and judgment in refining matters, seeking his advice on frequent occasions, and at times coming to the Simms Refinery to talk with him. During such visits, Murphy talked with Burns about the defendant's plant, and frequently Burns went to the Cross Refinery, and there was direct evidence that Murphy had called him to the plant several times. A witness employed at the Simms plant testified that he had seen Murphy at the Simms plant about once a month; that he heard Burns and Murphy discussing refinery problems; and that Murphy came and got Burns several times before the accident, and that Burns, on such occasions, would go to the Cross Refinery with Murphy.

There was, to be sure, testimony introduced by defendant, tending to show that Burns and Soars entered the plant on the occasion of the accident for another purpose, but the jury, having returned a verdict for plaintiff, must have accepted plaintiff's testimony as true, and disbelieved that of defendant.

An invitation to enter upon property of another may be either express or implied, and the rights of the invitee and the duties of the inviter are the same in either case. The oral testimony, when considered in connection with the surrounding facts and circumstances, tended to prove that Burns was not a trespasser; that he was more than a bare licensee. He entered the premises on the invitation of the person in charge on a mission supposed to be beneficial to the owner. In Middleton v. P. Sanford Ross (C.C.A.5) 213 F. 6, 10, the rule is stated as follows: "Invitation of the owner or occupant is implied by law where the person goes on the premises for the benefit, real or supposed, of the owner or occupant,

or in a matter of mutual interest, or in the usual course of business, or for the performance of some duty."

On this phase of the case, we conclude that there was substantial evidence from which the jury might have found, as they manifestly did, that Burns was on the premises of the defendant for its advantage, and, hence, he had the status of an invitee. But it is urged by defendant that there was no substantial proof that Murphy had authority to invite Burns into the plant for the purpose of advising him with reference to the operating problems which were then confronting defendant. Murphy was defendant's superintendent, in charge of this plant. Burns' mission being for the real or supposed benefit of the owner, invitation was implied as a matter of law. He had frequently been in this plant with Murphy.

In Fleischmann Malting Co. v. Mrkacek (C.C.A.7) 14 F.(2d) 602, 604, the rule relative to invitation from an employee is stated as follows: "This plant was located many blocks from other plants in Chicago of plaintiff in error, and miles from its general office. While there was a general superintendent, it was the foreman who was in immediate charge of the moving, placing, loading, and unloading of the cars, and the evidence indicated he had apparent authority to permit to be done what was done, even to the extent of asking these women to sweep up all of the droppings about the premises where they were working. Being in immediate control, the jury was warranted in concluding that he had such apparent authority, and this in our judgment was sufficient. Ill. Cent. R. R. Co. v. Griffin, 80 F. 278, 25 C.C.A. 413; De Haven v. Hennessey Bros. Co., 137 F. 472, 69 C.C.A. 620."

In addition to this, there was direct testimony that Murphy had authority to admit to the plant. Lynch, acting chief operator of the defendant, testified that he had orders to send any one desiring to go inside the plant to the office of Mr. Bingham or Mr. Murphy; that he had seen people come into the plant with Mr. Murphy several times; that Mr. Murphy in the absence of Mr. Bingham had authority to admit visitors or others; and that Bingham was not present at the time of the accident. Mr. Fox, vice president of the defendant, testified that Murphy was second in command to Bingham, and that if Bingham was not present Murphy would have had authority to admit persons coming to the plant. Murphy had authority to employ others to assist in operating the plant. We are of the view that the evidence warranted the jury in finding that Murphy had authority to invite Burns to enter defendant's premises, and he, therefore, had the status of an invitee while on the premises.

Even though an invitee, defendant was not an insurer of his safety on its premises, but owed him the duty of exercising ordinary care for his safety. Bennett v. Louisville & N. R. Co., 102 U.S. 577, 26 L.Ed. 235; Sears, Roebuck & Co. v. Peterson (C.C.A.8) 76 F.(2d) 243; Ten Broeck v. Wells, Fargo & Co. (C.C.) 47 F. 690; Pennsylvania R. Co. v. Atha (D.C.) 22 F. 920; Standard Steel Car Co. v. McGuire (C.C.A.3) 161 F. 527; Pacific Hardware & Steel Co. v. Monical (C.C.A.9) 205 F. 116; Kapuscianski v. Coal & Iron Co., 289 Pa. 388, 137 A. 619; Hyatt v. Murray, 101 Minn. 507, 112 N.W. 881; Callan v. Pugh, 54 App.Div. 545, 66 N.Y.S. 1118.

On this phase of the case, it remains to consider whether there was substantial evidence of negligence on the part of the defendant which proximately caused Burns' injury and death. We have already adverted to the specific charges of negligence. It is insisted that the explosion was brought about through the closing of a rising stem valve on a line leading out of the caustic solution tank while naphtha was being forced into the tank by pump, which produced high and dangerous pressure, causing the tank to explode or to be torn loose from its base. Testimony shows that the tank was a secondhand one; that it had been used as early as 1921; that it had been condemned as dangerous in 1924; that it had been purchased by defendant for $20; that the bottom of the tank was convex and in order to set it upright defendant cut out the convex bottom, turned it over to make a base for the tower, and then set the upper part of the tank on top of this base and welded the top to the bottom; that there were no safety valves or pressure gauges on the tank; that the shell of the tank was welded to the bottom by an outside bead weld, which would not withstand pressure of over fifteen pounds and was intended for only atmospheric pressure; that a 6-4-6 pump was forcing gasoline into this tank; that Murphy directed an employee of the defendant to close the valve, and this was the only valve that could have caused the explosion. There was evidence that the valve was closed

pursuant to Murphy's directions. This occurred about 10 o'clock in the morning, before the accident occurred at 2 o'clock in the afternoon. There was evidence that the tank exploded, and there was testimony that if the valve was closed with the pump running against it, it would explode because the valve was the only outlet. There was other testimony with reference to the defective condition of the appliances, and evidence from which the jury might well have concluded that the defendant was negligent in the maintenance and operation of its plant, which caused the explosion resulting in Burns' death.

■ The question of negligence is usually one of fact for the jury, and it is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence becomes one of law for the court. Illinois Power & Light Co. v. Hurley (C.C.A.8) 49 F.(2d) 681; Philadelphia Storage Battery Co. v. Kelley-How-Thomson (C.C.A.8) 64 F.(2d) 834; Pryor v. Strawn (C.C.A.8) 73 F.(2d) 595.

But it is contended by defendant that if any negligence caused Burns' death, it was the negligence of the Ampco Engineering Company, an independent contractor. There was a contract between defendant and the Ampco Engineering Company, by which the engineering company agreed "to design, furnish all blue prints required and bills of material covering equipment required, superintendence of erection and superintendence of operation and other labors necessary for erecting for you a plant for distilling petroleum oils as described in the following paragraph entitled 'Property.'" The property described is as follows: "One pipe still distillation unit." The contract provides, among other things, that: "Our fee for the above services will be nine thousand ($9,000.00), payable twelve hundred dollars ($1,200.00) upon accepting this contract and twelve hundred dollars ($1,200.00) each thirty days thereafter until five (5) payments have been made; the balance of eighteen hundred dollars ($1,800.00) will be payable upon the completion of the test period demonstrating the guaranteed capacity of the plant. This contract may be cancelled by you at any time you are dissatisfied with the services we are rendering you and no payment which had not come due prior to cancellation of this contract will occur to this company." The contract also provides that during the test de-

fendant "shall furnish to us complete daily reports, such reports to show all reading of pyrometers, thermometers, pressure gauges, meters, tank gaugings and specific gravities required to determine accurately the results obtained, also laboratory reports on and percentages of stock charged to the still and all products made showing their character as required. It is our intention to assist you in a reasonable manner in obtaining the most economical operation after you assume control of the plant, and as a means to this end you shall continue to furnish to us complete reports for sixty days after completion of test."

■ First, it should be observed that Burns was not a party to this contract, and, hence, it was not binding upon him. Bertino v. Marion Steam Shovel Co. (C.C.A.8) 64 F.(2d) 409, 412, Yelloway, Inc., v. Hawkins (C.C.A.8) 38 F.(2d) 731. As said by us in Bertino v. Marion Steam Shovel Co., supra: "But the plaintiffs were not parties to the contract, and its terms were not binding upon them. As to them, the status of Titus must be determined by consideration of other matters than the contract between the coal company and the shovel company."

■ The contract covers only the distillation unit, which did not explode. By the terms of the contract all materials and all labor were to be furnished by defendant and not by the Ampco Engineering Company. The contract was one for engineering services. The testimony of witnesses who worked on the treating plant was that they were working for defendant and paid by it. Defendant's manager testified that he purchased the secondhand tank that formed the caustic tank of the treating unit which exploded. The compensation is referred to as a fee for services, and it is noted that these fees were to be paid from time to time as the work progressed, and were not contingent upon whether or not the contract work met with the requirements of the contract. Indeed, if the defendant should have rejected the work, it would simply have had on its hands an unsatisfactory plant, while the engineering company would have its fees practically all paid. The mode of payment for the work done is an element to be taken into consideration in determining whether the employee is an independent contractor, though it is not controlling. It is to be observed that the contract provided for cancellation at any time the defendant might

be dissatisfied; but this did not entitle defendant to a restoration of the fees which it had already paid. The vice president of the company testified that under this contract he had the right to discharge the Ampco Engineering Company at any time they were not doing the work to the satisfaction of defendant. This power was inconsistent with the full control of the work which is ordinarily to be enjoyed by an independent contractor, and is a circumstance tending to show that the engineering company was not an independent contractor.

It is also observed that the contract provided that the defendant should furnish the engineering company with complete daily reports. This clearly indicates that the plant was to be operated by defendant and not by the engineering company.

Other considerations are urged why it cannot be said that Burns' death was caused by the negligence of an independent contractor, but, without going into them, we conclude that the evidence was such as to warrant if not compel the jury to find that the negligence which caused the accident resulting in Burns' death was that of defendant and its employees. The court, therefore, did not err in denying defendant's motion for a directed verdict.

Complaint is made that the court should have amplified its instructions concerning the alleged construction of the distillation unit, but we are very clear that the jury must have found that the Ampco Engineering Company was not an independent contractor. We think the court's instructions on this question were substantially correct and certainly not prejudicial to the defendant. In those instructions the court defined an independent contractor, and advised the jury that if they should find that the engineering company constructed and operated the plant, and that the defendant was only interested in the results of the work, then the engineering company would be an independent contractor and that defendant would not be liable for the injuries resulting in the death of Burns. The court also instructed that if the engineering company was not an independent contractor, as defined in the instructions, but was an agent of defendant in the construction of the unit, then defendant was required to exercise such care as a reasonably prudent person would have exercised under the same or similar circumstances and conditions. The court then instructed as follows: "In determining whether the treating plant was constructed under the supervision of the Ampco Engineering Company as an independent contractor, you may take into consideration the contract introduced in testimony between Ampco Engineering Company and the Henry H. Cross Company, as to whether or not under its terms provisions were made for the erection of a treating plant; you may consider which of the parties provided the labor with which it was constructed, that is, by whom they were paid, and as to purchase, inspection and payment for the materials that were used in the construction of the tank, you may consider that in your deliberation, and which of the parties or their agents gave orders and directions for the carrying on of the work, and the rights of the parties to terminate the contract; these, together with all the other facts and circumstances which have been adduced in the testimony in connection with relation of the Ampco Engineering Company and the defendant, Henry H. Cross Company, may be considered by you in determining whether or not the treating plant was constructed by them, whether or not in said construction the Ampco Engineering Company was acting as an independent contractor."

The issue was fairly covered by the instructions which were as broad as the evidence warranted. The instructions requested by defendant, in so far as they contained a correct statement of the law, were sufficiently covered by the court's instructions.

We are of the view that the record discloses no prejudicial error in the trial of this action, and the judgment appealed from is therefore affirmed.