**BIRMINGHAM v. BARTELS et al.**
**SAME v. GEER et al.**

**WILLIAMS et al. v. BARTELS et al.**
**Nos. 13124, 13125, 13127.**

Circuit Court of Appeals, Eighth Circuit.
Sept. 25, 1946.

Writ of Certiorari Granted Jan. 6, 1947.
See 67 S.Ct. 494.

GARDNER, Circuit Judge, dissenting.

———◆———

Lyle M. Turner, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, and Harold D. Cohen, Sp. Assts. to Atty. Gen., Maurice F. Donegan, U. S. Atty., of Davenport, Iowa, and Cloid I. Level, Asst. U. S. Atty., of Des Moines, Iowa, on the brief), for E. H. Birmingham, appellant.

Joseph A. Padway and Robert A. Wilson, both of Washington, D. C., and Chauncey A. Weaver, of Des Moines, Iowa, for Griff Williams et al., interveners, appellants.

Thomas B. Roberts and Clyde B. Charlton, both of Des Moines, Iowa, for Roy Bartels et al. and Larry V. Geer et al., appellees.

Gordon Diesing, of Omaha, Neb. (William J. Hotz, William F. Dalton, and Hotz & Hotz, all of Omaha, Neb., on the brief), for Nebraska National Hotel Co., amicus curiae.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

These are appeals by a Collector of Internal Revenue from judgments of a District Court in favor of two ballroom operators[1] for refunds of social security taxes (retirement and unemployment), 26 U.S. C.A. Int.Rev.Code, §§ 1400,[2] 1410, 1600, collected from the operators on the leaders and members of a number of traveling orchestras, which had furnished the music, mostly on single-night engagements,[3] for some public dances held at the ballrooms during 1941 and 1942. The leaders of the orchestras which had played at one of the ballrooms intervened in that suit to oppose recovery and have also taken an appeal.

The question is whether such a relationship was involved in the engagements as entitled the Commissioner of Internal Revenue to treat the leaders and members of the orchestras as employees of the ballroom operators for social-security-tax purposes. The ballroom operators contended that the relationship between them and the leaders and members of the orchestras had not been that of employer and employee, but that each of the leaders was an independent contractor and that the members of the orchestras were employees of the leaders in the engagements. The District Court adopted this view, 59 F.Supp. 84, and held[4] that the tax authorities had accordingly erred in requiring the ballroom operators to pay social security taxes on the leaders and their orchestra-members.

---

[1] One of the ballrooms was located at Dubuque, Iowa, and the other at Fort Dodge, Iowa. They were separately owned and operated. The two suits for refunds were therefore independent, but they were consolidated for trial and also for hearing here.

[2] The ballroom operators had made no deductions from the amounts paid for the services of the orchestras, for employees' shares of taxes, under 26 U.S.C.A. Int. Rev.Code, § 1401, and so had been obliged to pay these portions also out of their own funds to the Collector.

[3] In the case of one ballroom, the engagements had all been for single nights. In the case of the other, there had been a number of engagements for two or three successive nights. There had also been repeat engagements by some of the orchestras during the period involved.

[4] The case was tried to the court without a jury.

The engagement in each instance was entered into by a standard-form contract,[5] referred to as "Form B", which the American Federation of Musicians [6] had prepared in 1941 and thereafter required all its members to use. The contract designated the ballroom operator as "employer" and the leader and his orchestra-members as "employees". It contained a recitation that "the employer employs the personal services of the employees, as musicians severally", and a provision that "the employees severally, through their representative, agree to render collectively to the employer services as musicians in the orchestra under the leadership of [the regular leader, by whose name the orchestra was known]", in accordance with the terms and conditions of the contract. The place, the date, and the hours of the engagement were specified, together with the price to be paid, which was set out as a lump sum, with the option in some instances to take a fixed percentage of the gross receipts of the dance.

The contract further provided: "The employer shall at all times have complete control of the services which the employees will render under the specifications of this contract. On behalf of the employer the Leader will distribute the amount received from the employer to the employees, including himself, as indicated on the opposite side of this contract, or in place thereof on separate memorandum supplied to the employer at or before the commencement of the employment hereunder and take and turn over to the employer receipts therefor from each employee, including himself. The amount paid to the Leader includes the cost of transportation, which will be reported by the Leader to the employer. The employer hereby authorizes the Leader on his behalf to replace any employee who by illness, absence, or for any other reason does not perform any or all of the services provided for under this contract."

The Regulations defining employer-employee relationship for social-security-tax purposes, Treasury Regulations 106, § 402.204, Treasury Regulations 107, § 403.-204, promulgated under the authority of 26 U.S.C.A. Int.Rev.Code, §§ 1429, 1609, provide: "Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee. Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to *what* shall be done but *how* it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee. Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

---

5 Generally the engagements of the orchestras were made through booking agencies, with the booking agency executing the contract as representative of the leader and members. Some times the leader also. signed the contract. Each contract, of course, was executed by the ballroom operator.

6 The A. F. of M. is a national labor union, of which both the leaders and their musicians were members.

If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor. * * *"

The Regulations have merely reiterated definitions and tests of the common law for determining master-and-servant and independent-contractor relationships in vicarious tort-liability. Cf. Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440; Casement v. Brown, 148 U.S. 615, 622, 13 S.Ct. 672, 37 L.Ed. 582; Restatement, Agency, § 220.[7]

It will be noted that the "Form B" contract expressly purported to establish the common-law relation of employer and employee between the ballroom operator and the leader and each of his orchestra-members by providing, after designating the ballroom operator as "employer" and the leader and his orchestra-members as "employees", that "The employer shall at all times have complete control of the services which the employees will render under the specifications of this contract." That the purpose of the American Federation of Musicians in adopting the contract form was to shift as nearly as possible the social-security-tax burden previously borne by a leader on his orchestra-members to those engaging the services of the orchestra, and also to bring the leader himself under the benefits of the Social Security Act, is conceded.

Previously, an orchestra assembled and directed by a leader and performing transient engagements for establishment owners, such as hotels, clubs, ballrooms, etc., for which the leader or his booking agent entered into the contracts, had been regarded as an entrepreneurial enterprise of the leader. Thus, in Williams v. United States, 7 Cir., 126 F.2d 129, certiorari denied 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527, such a leader had been held to be an independent contractor and to be liable for the payment of social security taxes on his orchestra-members. Spillson v. Smith, 7 Cir., 147 F.2d 727, had repeated this view. There had been holdings also by state courts, under state unemployment-insurance statutes, that leaders of orchestras, who directed, hired and fired, and were liable to the individual musicians for their services, were the employers of the orchestra-members, as opposed to the owners of the establishments with whom the engagements were had, even where the engagements had been for extensive periods, the performances had constituted a part of the regular business of the establishment-owner, and the estab-

---

[7] Some Circuit Courts of Appeals have declared that the conventional application of these principles governs the liability for social security taxes. See Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715, 717; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636, 638, 639; McGowan v. Lazeroff, 2 Cir., 148 F.2d 512, 513; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 492, 493, 147 A.L.R. 824; Glenn v. Standard Oil Co., 6 Cir., 148 F.2d 51, 53; United States v. Mutual Trucking Co., 6 Cir., 141 F.2d 655, 659; Glenn v. Beard, 6 Cir., 141 F.2d 376, 377; Spillson v. Smith, 7 Cir., 147 F.2d 727, 728; Williams v. United States, 7 Cir., 126 F.2d 129, 132; Indian Refining Co. v. Dallman, 7 Cir., 119 F.2d 417, affirming D.C., 31 F.Supp. 455; Anglim v. Empire Star Mines Co., 9 Cir., 129 F.2d 914, 917; Jones v. Goodson, 10 Cir., 121 F.2d 176, 180. The Supreme Court, however, has made it clear that in social legislation the employer-employee relation is not necessarily a blueprint of common law concepts, but that under any such statute the area between unequivocal employment and unmistakable entrepreneurial enterprise is entitled to be surveyed and platted in practical industrial and economic perspective and with regard for its special remedial purpose. See National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 126, 127, 64 S.Ct. 851, 857, 88 L.Ed. 1170. Cf. also United States v. Vogue, Inc., 4 Cir., 145 F.2d 609, 612, 613; Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679, 680, 681; United States v. Aberdeen Aerie No. 24 of Fraternal Order of Eagles, 9 Cir., 148 F.2d 655, 658. House Report No. 728, 76th Cong., 1st Sess., p. 76, had in similar vein declared that "a restrictive view of the employer-employee relationship should not be taken in the administration of the Federal old age and survivors insurance system, in making coverage determinations."

lishment-owner had exercised some measure of control over the execution of the performances. See e. g. People v. Grier, 53 Cal.App.2d Supp. 841, 128 P.2d 207; and cf. also Hill Hotel Co. v. Kinney, 138 Neb. 760, 295 N.W. 397; Seattle Aerie No. 1 of Fraternal Order of Eagles v. Commissioner of Unemployment Compensation, 23 Wash.2d 167, 160 P.2d 614, 163 P.2d 921.

After the "Form B" contract came into use, however, the Commissioner of Internal Revenue had ruled that an establishment-owner engaging the services of an orchestra under such a contract and receiving performance thereunder was liable as an employer for the payment of social security taxes on the leader and the members of the orchestra, because the contract, as a matter of specific legal obligation, gave him "complete control" of the services of both the leader and the orchestra-members in the performance of the engagement, even though he might not choose to exercise it. See A & C: IT-Mimeograph Coll. No. 5638, R.A. No. 1339, dated February 21, 1944.

▮ The crux of the common-law distinction between an employer-employee relationship and an independent-contractor status is in the right of the person for whom the services are performed to control the person performing them, "not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished" (Treasury Regulations, supra), or in other words "not only to direct what shall be done, but how it shall be done" (New Or-

leans, M. &. C. R. Co. v. Hanning, 15 Wall. 649, 657, 82 U.S. 649, 657, 21 L.Ed. 220).[8] It is not necessary that the employer actually shall direct the manner in which the services are performed, but "it is sufficient if he has the right to do so." Treasury Regulations, supra. Cf. Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679, 681.

▮ A contract therefore which obligationally gives complete control of the services which one person agrees to perform for another to the person for whom the work is to be done—such as does the contract here—establishes on its face the legal relationship of employer and employee as it existed at common law. The relationship is capable of being changed, of course, by an abrogation of the provision for control, through either an express agreement of the parties or an implied agreement from circumstances demonstrative of a mutual abandonment of it—like any other voluntary modification or rescission, Restatement, Contracts, § 406, Comment b. But obligational provisions in a contract cannot be held to have been so abrogated on equivocal showings. Clear and convincing proof has always been required as a basis for granting a judicial rescission, United States v. Maxwell Land Grant Co., 121 U.S. 325, 381, 7 S.Ct. 1015, 30 L.Ed. 949, and the rule is the same as to recognizing an alleged abrogation by the parties themselves, Peck v. Stafford Flour Mills Co., 8 Cir., 289 F. 43, 45. Thus, in the latter case, where the action was one for damages in breach and the principal defense was that the contract had been mutually

---

[8] "A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." Restatement, Agency, § 220(1).

"While it is said that at common law there are four elements which are considered upon the question whether the relationship of master and servant exists, —namely, the selection and engagement of the servant, the payment of wages, the power of dismissal, and the power of the control of the servant's conduct,— the really essential element of the relationship is the right of control—the

right of one person, the master, to order and control another, the servant, in the performance of work by the latter, and the right to direct the manner in which the work shall be done." 35 Am.Jur., Master and Servant, § 3, p. 445.

"Perhaps one of the most frequently quoted [definitions of independent contractor] is to the effect that an independent contractor is one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work." 27 Am.Jur., Independent Contractors, § 2, p. 481.

abandoned, this Court said that, while a written contract could be changed or abandoned by parol, the evidence to show such a change or abandonment "must be clear and convincing as to the oral agreement." See also Restatement, Contracts, § 511.

The ballroom operators point out that the action here is by a stranger to the contract and that the limitations of the parol evidence rule therefore do not apply.[9] That, of course, is true, but it does not assist in solving the real question in the situation. Exemption from the parol evidence rule simply gave the ballroom operators the right to contradict the terms or obligations of the written contract. It left them free to prove by parol, if the facts so were, that instead of the agreement having been that the legal right of control of the leader's and orchestra-members' services should be given to the ballroom operators, the agreement actually was that it should remain in the leader, or that the parties had never in fact undertaken to agree as to who should have the legal right of control.

■ The evidence, however, in our opinion, fails to establish either of these situations in relation to the negotiation and execution of the contract. To the contrary it shows that, when the "Form B" contract initially was presented to the ballroom operators in engaging the services of an orchestra, they had objected to the provision giving them the legal right of control

and making them employers, until they were told that this was the only basis on which they could obtain the services of the orchestra, and that they thereupon executed the contract and each of the other contracts thereafter and accepted the services of the various orchestras under them. On these facts we think it must be held that the parties in their negotiation and execution of the contract had specifically agreed that the ballroom operators should have the legal right of control over the services of the leader and the orchestra-members and so had created the common-law relation of employer and employee between them, at the time the contracts were executed at least. This then would make the question whether the provision for legal right of control could, on proper standards, be said to have been thereafter abrogated so as to have changed the created relationship.

■ The District Court fell into the error of refusing to recognize the contract as having legally created the relationship of employer and employee at the time of its execution and then undertaking to determine simply whether the evidence showed a subsequent abrogation of that relationship by the parties. It treated the provision for control as if it never had been an obligation of the contract but only a recital or description in the instrument [10] and so merely "an element that may be considered by the fact finder if of any assistance in

---

[9] Though the point is of no importance here, Williston's critical observation may be noted in passing, that the cases in which the stranger-to-the-contract exemption from the parol evidence rule has been applied have involved mostly contradictions of recited facts or proof of fraud against the rights of third persons, rather than contradictions of express obligations of the instrument. 3 Williston on Contracts, Rev.Ed. § 647, p. 1869. See also 9 Wigmore on Evidence, 3rd Ed., § 2446, p. 149.

[10] Specific obligations in a contract legally definitive of a created relationship cannot be dealt with on the same level as general recitals or descriptions which the other circumstances of the situation show to be meaningless or of only slight implication. The most common instance of such a recital or description in a contract for services is where it is attempted to term the relationship as oth-

er than one of employer and employee, such as by describing the workman as an independent contractor or by a recital that "Nothing contained herein shall be construed to create the relationship of employer and employee." Courts do not hesitate to ignore such recitals or descriptions which are inconsistent with the other equally important general circumstances of the situation. For examples of such cases, see Matcovich v. Anglim, 9 Cir., 134 F.2d 834; McDermott v. Henricksen, D.C.Wash., 45 F.Supp. 277; Industrial Commission v. Northwestern Mutual Life Ins. Co., 103 Colo. 550, 88 P.2d 560. In the same manner, an artificial designation of an independent contractor as an employee was ignored in Williams v. United States, 7 Cir., 126 F.2d 129. These cases, however, do not warrant the similar ignoring of express obligations in a contract in favor of extraneous circumstances.

determining what is the true relationship." 59 F.Supp. at page 88. It then held that the provision for control was not "of any assistance" as "an element", because "the contract was not entered into by fair negotiations between the parties, but upon demand of the musician's union and the requirement that it must be signed or no orchestra could be obtained," and for the further reason that the provision was in any event meaningless because the control could never be exercised. "If the owner attempted to exercise any such right of taking charge and control of the orchestra it would destroy the orchestra and the result of a satisfactory entertainment. It just could not be done." 59 F.Supp. at pages 88, 89. Finally, the Court said that the whole thing could be ignored also as constituting merely "an anticipatory arrangement to escape taxation."

█ ██ A court of law cannot ignore a contract because of alleged unfairness in the negotiations by which the obligation has been created, unless the unfairness amounts to duress or fraud capable of avoiding the contract. Duress or fraud has not been set up here, nor has either of them been attempted to be proved. Mere inequality in economic bargaining power is not legal unfairness which will permit either party to avoid a contract or a court to ignore it. The balancing of bargaining power between economic classes is of the legislative and not the judicial domain. The fact that the ballroom operators here had objected to the provision for control, but were obliged to accept it in order to obtain the services of the orchestras, to our mind only serves to emphasize the reality of the making of the agreement.

█ The view that the provision for control could be ignored as being unexercisable and hence meaningless is also legally untenable. It is equivalent to saying that the leaders and members of organized orchestras are unable legally to become employees of those for whom they perform engagements. Whatever may be the consequence to the reputation of an orchestra in obtaining other engagements or to the quality of the performance to be rendered under an immediate contract, the control of the orchestra's services certainly is capable of being so vested legally in the operator of a hotel, club, ballroom, or other establishment, as to permit of the creation of an employer-employee relationship. It matters not legally whether the hotel manager, club president, or ballroom operator has the capacity, desire, or intention to meddle into the technique of the musical performance. That is not the test or the essence of the creation of the legal right of control for which the contracts here provide. The legal scope of the right in the present situation is unqualifiedly clear— "complete control". The extent to which ballroom operators might deem it practical in their own interest to exercise the right could well vary, but that aspect is not of legal importance, and one instance from the record will serve to illustrate generally that as a matter of fact the right here did have not merely a legal but a practical reality as well. In one of the engagements in suit the orchestra appeared without its regular piano player and the ballroom operator exercised the prerogative of selecting and requiring the leader to use a certain local musician for the performance.

█ The view that the provision for control could be ignored as an improper scheme or device on the part of the leaders to escape taxes equally has no validity in the situation. In the first place, the contract does not operate to deprive the Government of any taxes which it otherwise would have received. Next, if the legal relationship of employer and employee was created between the ballroom operators and the orchestra-members, as it was here in the circumstances of the negotiation and execution of the contract, and that relationship had not thereafter been abrogated, the ballroom operators were simply bearing the burden of the taxes which the statute imposes upon any one who occupies an employer's status. That it was the purpose of the orchestra-leaders to rid themselves of taxes by creating an employer-employee relationship with the ballroom operators can hardly constitute a shield to the ballroom operators, if such an employment relationship legally was created and legally continued to exist. Nor are the ballroom operators able to escape the taxes arising

out of the engagements because the leaders may be liable for social security taxes on their orchestra-members in their relations outside such engagements.[11]   Clearly, a person can be an independent contractor in one part of his activity and an employee in another.  Cf. Cowles v. J. C. Mardis Co., 192 Iowa 890, 181 N.W. 872.  And, even if the general relationship of a leader to his orchestra-members outside the specific engagements was such that the Commissioner of Internal Revenue could have insisted that the leader should pay social security taxes on his orchestra-members all the way down the line and that the brief legal relationships of employer and employee created with the ballroom operators would be ignored for practical purposes of the Treasury in collection or handling or for other reason, this would not help the ballroom operators here.  The Government not infrequently has the right to choose between legal and practical situations in tax matters, Higgins v. Smith, 308 U.S. 473, 476, 477, 60 S.Ct. 355, 84 L.Ed. 406, but the right to make the choice in such an alternative situation is the Commissioner's, and a taxpayer who has a legal liability for the tax cannot complain of the choice.  Courts are concerned only with the legality of what is done in matters of taxation and not with the wisdom or policy of the action.

. The ballroom operators have made some arguments why the provision for control was entitled to be ignored, with which the District Court apparently felt it unnecessary to deal in view of the conclusion which it had reached.  Principally, they call attention to the fact that the "Form B" contract contained a clause that "It is agreed that all the rules, laws and regulations of the American Federation of Musicians * * * are made part of this contract"; that the by-laws of the Federation in force at the time the "Form B" contract was adopted by its executive board and put into effect by order of its president contained provisions referring to the leaders as employers or contractors and to the orchestra-members as employees of the leaders and declaring that "Members of the Federation are only permitted to accept, solicit or negotiate engagements to play in bands or orchestras from members who contract to furnish bands or orchestras, never from the employers or the agents of such to whom the band or orchestra is furnished * * *"; and that these provisions of the by-laws were not formally repealed or changed until some time after the engagements that are here involved.  There was, however, another provision in the by-laws giving the president of the Federation the power "to make decisions in cases where, in his opinion, an emergency exists; and to give effect to such decisions he is authorized and empowered to promulgate and issue executive orders, which shall be conclusive and binding upon all members * * *;  any such order may by its terms * * * annul and set aside [the Constitution, By-Laws, Standing Resolutions, or other laws, resolutions or rules of the Federation] or any portion thereof * * * and substitute therefor other and different provisions of his own making; the power so to do is hereby made absolute in the President * * *."

While the order of the president requiring the use of the "Form B" contract in all engagements thereafter made did not in express terms annul or set aside any of these by-laws, there can hardly soundly be any doubt that his edict that "This contract and none other must be used on all such engagements on and after June 1, 1941" and "Any member or any officer who assists a member in preparing a contract on any other form will be in violation of the laws of the American Federation of Musicians and will be subject to charges for said violation" sufficiently required, under the absolute powers vested in him,[12] that the by-laws thereafter, as a union mat-

---

[11] The record indicates that the leaders generally had agreed to pay or guaranteed each orchestra-member a certain amount weekly and that if the sums payable to the members from the specific engagements during such a period did not equal this amount the leaders made good the difference out of their own pockets.

[12] With the question whether the union could be regarded as being democratic in the light of its president's absolute powers, we are, of course, not here concerned.

ter, be read in harmony and reconciliation with the relationship attempted to be created by the provision for control in the "Form B" contract.

The provision for control cannot therefore be ignored on the basis of this argument of the ballroom operators. The other minor arguments made why the contract provision could be ignored do not require discussion.

This leaves then as the only remaining question whether the provision for control could be said to have been subsequently abrogated, so as to have changed the employer-employee relationship which had been created at the time the contract was negotiated and executed. The District Court, as we have indicated, erroneously treated the situation as if the provision for control had not created the relationship of employer and employee at the time the contract was executed and that the question therefore simply was one of determining the legal relationship on the basis of the general circumstances and the facts of performance—the same as if no obligation covering the right of control had been contained in the contract. It accordingly declared that, since the leader had exercised control over the performance and the ballroom operator had not, this "is sufficient to warrant a finding of the [leader's] right of actual control." 59 F.Supp. at page 89. It regarded as of weight also the leader's part in organizing the orchestra, his efforts generally to create a reputation for the orchestra under his own name, his relation with his musicians outside the contract-engagements, the fact that the ballroom operator was not required to furnish the musical instruments for the performance, and other such extraneous facts, which ordinarily are of assistance in determining whether an employer-employee relationship or an independent-contractor status exists, where there is no express contractual obligation covering the right of control.

But these facts, while perhaps ordinarily sufficient to support a finding as to where the right of control resides, when it has not been obligationally fixed by the contract, cannot in our opinion be declared to constitute clear and convincing evidence that there has been an abrogation of the obligation for control and that the relationship of employer and employee created by the negotiation and execution of the contract has been changed. The fact that an employee has been left to perform his tasks without direction, where no conversations or other incidents between the parties are shown to have occurred subsequent to the creation of the employer-employee relationship, is hardly satisfying proof of a mutual change in the contract, for it involves no inconsistency with the continued existence of the employer's right to control if he chooses to exercise it. And such extraneous facts, as that the person agreeing to perform the services normally is engaged in a distinct occupation or business, that the work to be done is a matter of special skill not usually performed under the supervision of the person for whom such services are rendered, that the workman is expected to furnish his own tools and instrumentalities, and other elements of that nature, which may be of value in throwing light on the intended relationship where the right of control is not contractually clear, can hardly be of much weight, or relevance even, in establishing that there had been a subsequent abrogation of the provision for control in the present case, since these are facts which had existence and were known to the parties at the time the contract was made and to which they manifestly chose to give no significance in obligationally fixing the power of control to create an employer-employee relationship for the particular engagements.

In summary, the relationship of employer and employee legally was created between the ballroom operators and the leaders and orchestra-members by the negotiation and execution of the obligation which gave the ballroom operators the right of complete control over the services, and it has not been shown by clear and convincing evidence that the right of control mutually was abrogated so as to have changed the employment relationship.

The judgments are accordingly reversed and the causes remanded.

GARDNER, Circuit Judge (dissenting).

I think the judgments should be affirmed. The basic facts are not in dispute. The actions were tried to the court without a jury and the trial court on consideration of the evidence entered findings as follows:

"1. That at all times, and during the times of the performance by the several orchestras on the premises of the plaintiffs, the leaders of the orchestras exercised entire direction and control, and the right of control, over their orchestras and the members thereof, and the method and manner of doing the work. Such leader exercised and had the exclusive right to hire and fire such members, to contract for and pay their wages, and to keep all profits and sustain and pay such losses as occurred from the performances. Such leader organized, managed and controlled such orchestras as an independent organization for hire, and the true relationship as shown by the evidence was that such leaders were independent contractors and the members of the orchestras their employees within the meaning of the Internal Revenue Statutes.

"2. The contract, Form B, was not entered into by fair negotiation between the parties, but upon demand of the musician's union and the leaders of the orchestras that it must be entered into or no orchestra could be obtained, and it was required to be so executed with the avowed purpose of protecting the leader from taxes as an employer. It was required by the leader to be entered into as an anticipatory arrangement to escape taxation. There was no difference in the conduct and control of the orchestras, or the right to so conduct and control such orchestras, subsequent to June, 1941, or by reason of the Form B contract, than there was before that time, and the true relationship at all times as between the plaintiffs and such leaders was that the latter were independent contractors.

"3. At the time of the execution of the contracts, Form B, neither the orchestra leader nor any of the sidemen intended thereby to transfer or give to the ballroom operators control of or the right to control the orchestra or the sidemen, or the method or manner of doing its or their work in any particular. And at the time of the execution of the contracts, Form B, the ballroom operators never intended thereby to have transferred to them or to receive or exercise the control of or the right to control the orchestras or any of the sidemen or the method or manner of doing its or their work in any particular.

"4. Considering all the facts and circumstances as disclosed by the evidence, including the contract Form B and its execution, none of the plaintiffs was at the time of the performance of the several orchestras on their premises the employer of the leader or of any of the members of the orchestras within the meaning of the Internal Revenue Statutes."

See Bartels v. Birmingham, D.C., 59 F. Supp. 84.

It was within the province of the trial court to draw such inferences from the basic facts and circumstances as were reasonably deducible. In effect the court found that the contract did not represent the true relationship of the parties; that it was not entered into by fair negotiations; that the right to control as well as the actual control was intended to be retained and was retained by the leaders and that the orchestras as independent organizations for hire were inherently incapable of being controlled by the ballroom owners. Judge Donohoe reached substantially the same conclusion in Nebraska National Hotel Co. v. O'Malley, D.C., 63 F.Supp. 26. Having so found, the trial court in the instant case concluded that the leaders were independent contractors and that they rather than the ball-room owners were the employers of the musicians or sidemen. The findings of the court are presumptively correct and are not to be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses, and hence, the weight to be given their testimony. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c. A finding of fact is clearly erroneous only when it is not supported by substantial evidence, or is arrived at by the application of a wrong principle of law. Sears, Roebuck & Co. v. Talge, 8 Cir., 140 F.2d 395. We have held that substantial evidence is such

" 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Archer v. Securities & Exchange Commission, 8 Cir., 133 F.2d 795, 799. In determining whether there is substantial evidence to support the findings of the trial court, this court should consider the evidence most favorably to the party prevailing (United States v. Perry, 8 Cir., 55 F.2d 819), and when different conclusions may reasonably be drawn from the evidence, the question as to which inference · should be drawn is for the trial court and not for the appellate court. Luzier's, Inc., v. Nee, 8 Cir., 106 F.2d 130; Brooks v. Willcuts, 8 Cir., 78 F.2d 270. Even where the evidence is undisputed, if different conclusions may reasonably be drawn a question of fact is presented. F. T. Dooley Lbr. Co. v. United States, 8 Cir., 63 F.2d 284. It is conceded by the majority opinion that,

"Previously, an orchestra assembled and directed by a leader and performing transient engagements for establishment owners, such as hotels, clubs, ballrooms, etc., for which the leader or his booking agent entered into the contracts, had been regarded as an entrepreneurial enterprise of the leader. Thus, in Williams v. United States, 7 Cir., 126 F.2d 129, certiorari denied 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527, such a leader had been held to be an independent contractor and to be liable for the payment of social security taxes on his orchestra-members."

It is also conceded that there had been holdings by the State Courts that leaders of orchestras who directed, hired and fired, and were liable to the individual musicians for their services, were the employers of the orchestra members. It is therefore clear that the majority opinion is bottomed entirely upon the Form B contract entered into between the orchestra leaders and the ball-room owners. The government, to be sure, was not a party to this contract, and if it did not in fact create or change the relationship of the parties it should not be of controlling effect. The trial court took it into consideration together with all the evidence and circumstances and found that it did not change the relationship of the parties as it had theretofore existed, and that the orchestra leaders were the employers of the musicians, and were independent contractors so far as the ball-room owners were concerned. None of the sidemen or musicians, aside from the leaders, executed any of the contracts, and the contract terms designating or giving appellation to a relationship in form created by them, are not in any sense conclusive. Parties can not by the use of legal terms make impotent the legislative arm of the government. The actual facts, not the names or terminology employed, must govern. Doll v. Commissioner, 8 Cir., 149 F.2d 239; Spillson v. Smith, 7 Cir., 147 F.2d 727; Matcovich v. Anglim, 9 Cir., 134 F.2d 834; Industrial Commission v. Northwestern Mutual Life Ins. Co., 103 Colo. 550, 88 P 2d 560; Jack & Jill, Inc., v. Tone, 126 Conn. 114, 9 A.2d 497; Bertino v. Marion Steam Shovel Co., 8 Cir., 64 F.2d 409; Gulf Refining Co. v. Brown, 4 Cir., 93 F.2d 870, 116 A.L.R. 449; Sanford v. Goodridge, 234 Iowa 1036, 13 N.W.2d 40; Glielmi v. Netherland Dairy Co., 254 N.Y. 60, 171 N.E. 906; Nestle's Food Co. v. Industrial Commission, 205 Wis. 467, 237 N.W. 117; In re Morton, 284 N.Y. 167, 30 N.E.2d 369; Griffiths v. Helvering, Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Moline Properties, Inc., v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. This principle or rule is particularly pertinent in tax matters. Taxation is a practical matter dealing with realities and the power of taxation is not to be restricted by mere legal fictions, but substance rather than form controls in applying tax laws. Ruben v. Commissioner, 8 Cir., 97 F.2d 926; Helvering v. Tetzlaff, 8 Cir., 141 F.2d 8; Paschal v. Blieden, 8 Cir., 127 F.2d 398; Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520.

Congress imposed a social security tax upon employers and any contractual devices seeking to shift that tax from the class designated by Congress must at least be subjected to scrutiny to determine whether the law is being circumvented. Thus, words contained in a contract providing that nothing in it should be construed to create the relation of employer

and employee, have been held to be only "a slight element in assisting the court in a determination of the term 'employment.'" Industrial Commission v. Northwestern Mutual Life Ins. Co., Colo., 103 Colo. 550, 88 P.2d 560, 565. In Willard Sugar Co. v. Gentsch, D. C. Ohio, 59 F.Supp. 82, 84, Judge Freed said:

"The written contract in evidence, in which it is specifically recited that the plaintiff shall exercise no control or supervision over Kolb except as to the results of his work; and the printed contract between Kolb and the plaintiff furnished on the required form to the Public Utilities Commission of Ohio, in which there is an assertion that Kolb is an independent contractor, constitutes some evidence as to the relationship between Kolb and the plaintiff.

"These recitals or written provisions in the contracts, however, are not convincing. It is entirely unimportant what designation or terminology was used in these written instruments to denote the relationship of the parties, when the evidence persuasively shows that the relationship was that of employer and employee and not of contractor and contractee."

The Collector in his brief states:

"We agree with the District Court that actual control was seldom, if ever, exercised by the taxpayer personally and we agree also that by the very nature of the services of professional musicians, who work together as a group, their performances are usually directed by the leader."

It is insisted, however, that the "requisite right of control" could be placed in the ball-room operators if the parties so agree, and in effect make the orchestra leaders foremen of a group to conduct them in the performance of certain services. This view seems to form the basis for the conclusion reached by the majority opinion. It is stated in the opinion that,

"It is not necessary that the employer actually shall direct the manner in which the services are performed, but 'it is sufficient if he has the right to do so' (Treasury Regulations, supra)."

This reasoning overlooks the fact that the court found that the contract not only did not create the relationship of employer and employee, but was not intended so to do; that such relation did not in fact exist and that the so-called contract was a mere subterfuge by which it was sought to shift the burden of tax from that class designated by the Act of Congress to others not so designated. This in fact was the sole purpose of this formal contract. As said by this court, speaking through Judge Stone, in Doll v. Commissioner of Internal Revenue, supra [149 F.2d 244]:

"We have here a written instrument which is sufficient to create a partnership, both at common law and under Missouri decisions. Schneider v. Schneider, 347 Mo. 102, 146 S.W.2d 584; Stone v. Guth, 232 Mo.App. 217, 102 S.W.2d 738. The judgment here is at most an adjudication of what was never in doubt. The existence of such a contract is not determinative of this tax issue. There remains the impact of the test of an analysis of 'all the circumstances attendant on its creation and operation.'"

It is important to bear in mind that the government is not a party to this contract and the court has found on abundant evidence that it was entered into for the purpose of creating an appearance, not of creating a reality. The mere fact that there may be an abstract legal right of control as between the parties is not material because all the circumstances show that this abstract right was a mere subterfuge or fiction by which to avoid the act of Congress by shifting the tax from those intended by Congress to be subjected thereto. The evidence, including the attending circumstances, abundantly sustained the court in finding that the contract provision was intended to conceal the real relation of the parties as it was recognized by them and found by the trial court. We have in principle condemned such an instrument even as between the parties. Thus, in Burroughs Adding Machine Co. v. Bogdon, 8 Cir., 9 F.2d 54, 56, it is said:

"The instrument is obviously intended to convey the impression that it is a lease. It is designated 'a machine lease' and the words 'lease,' 'lessor,' 'lessee,' 'rentals,' and 'rent' are frequently employed therein. While the use of these terms has an un-

doubted weight in determining the character of the instrument, it is not controlling."

Again, in E. C. Warner Co. v. W. B. Foshay Co., 8 Cir., 57 F.2d 656, 659, we said:

"So far as the form of the transaction is concerned, no usury is disclosed. Courts, however, are not bound by what the parties represent themselves to be doing, but will look beyond the mere form of the transaction to its substance. Usury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it. If it appears that the transaction as disclosed by the testimony and the surrounding facts and circumstances was in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, then, regardless of the forms or devices resorted to to conceal the character of the transaction, the parties thereto are subject to the consequences provided by the usury statutes."

Even a deed of warranty will be held to be a mortgage if in fact given to secure an obligation.

The facts and circumstances which seem to me abundantly to sustain the court's finding may be briefly referred to. The leaders of the orchestras were dependent for patronage upon a reputation for playing dance music in a distinctive style. These leaders selected the musicians, the instruments, and the musical arrangements. They trained the musicians and rehearsed the musical selections for the purpose of performing this distinctive style. In playing engagements—usually single evening performances—the leader led and directed the musicians so as to make certain that the production was of the type the public identified as his. The name of the leader was extensively advertised. The ball-room operator relied upon the orchestra leader to bring to his ball-room an organization capable of performing in a satisfactory manner and in the distinctive style recognized as belonging to that organization. The musicians or sidemen were selected and hired by the leader and were discharged by him. The ball-room operators never hired nor discharged any sidemen and they never had any conversation with the leader or sidemen about discharges. Salaries and wages of the sidemen and length of the terms of their employment were agreed upon by the leader when he made his arrangements with the sidemen and this was all done long before any appearance at the ball-rooms of the appellees. The compensation of the sidemen was usually a flat weekly rate which the leader was bound to pay regardless of whether or not the orchestra played engagements. Some leaders kept a regular payroll, showing the names of the sidemen and the amounts of their compensation. Appellees did not even know the amount of compensation paid the sidemen, nor the manner of payment. Indeed they had nothing whatever to do with determining the amount. Appellees paid a gross contract price for each engagement, which was determined through negotiations between them and the leader or the booking agent. The performance price was paid to the leader or his booking agent, never to the sidemen. Profits, after expenses were paid, belonged to the leader. If a loss resulted, he bore it. In the performance of his engagement each leader dictated such matters as the style of music, its length, tempo and volume. He owned the musical library of sheet music which was used by the orchestra, and designated the various selections to be played therefrom; determined the number of sidemen, prescribed and furnished the form of attire worn by the sidemen, provided the music racks and public address system, provided or arranged for the means of transportation to and from the particular engagement, determined the placing of the musicians on the bandstand or rostrum, conducted rehearsals prior to the engagement, and planned and directed the presentation of any featured numbers.

There is no evidence that appellees ever gave any directions or instructions to the leader or sidemen of any orchestra, or ever offered or assumed the right so to do. There is evidence that a leader might ask what patrons liked and the answer might be to mix them up, not to play all waltzes. This, however, is a far cry from control. It indicates rather that the bandleader wanted advice as to what a particular group might want played. At most it

showed cooperation. There was testimony that the operators told the leaders when to take intermissions. This is certainly unimportant and not inconsistent with the finding that the leaders were independent contractors, especially when considered with the mass of testimony going to show that the actual control and operation of the orchestra were in the leader. The trial court surely might reasonably have concluded that an independent contractor might in many things defer to the judgment of one who engaged him and in whose place he was performing. Even this meager testimony as to actual control was denied and the finding of the trial court should be conclusive on that question. Sidemen were often paid by a check on the leader's account in the bank. Leaders of the orchestras testified that there was no difference or change in their operation after the Form B contract was in effect and prior thereto, in performing in appellees' ball-rooms.

The quality of the music produced by these orchestras depended primarily on the ability of the individual musicians, the instrumentation, the selections played, and the skill of leadership. All these matters rested within the leader. The appellees were not skilled musicians and the testimony is uncontradicted that they never had anything to do with hiring or firing the personnel of the orchestra.

The evidence is clear and convincing that the leaders exercised complete control of the means and manner of performance. They and they alone had the right to hire and fire; they and they alone determined the wages of the sidemen; and they and they alone actually paid the sidemen. The leaders were conducting an enterprise for profit, building up a name and reputation for themselves and their orchestras. The findings of the trial court that the leaders were in fact the employers is sustained not only by substantial evidence but by convincing proof. In fact, a finding that the contract correctly reflected the relationship of the parties would, I think, find no support in the evidence. No case could more convincingly illustrate an agreement which purported to create a certain relationship while the actual conduct and operation of the parties established another. At most the contract was simply a circumstance to be considered in determining the relationship of the parties. It was not exclusive, and as said by the Circuit Court of Appeals of the Fourth Circuit, in Gulf Refining Co. v. Brown, 93 F.2d 870, 873, 116 A.L.R. 449:

"It is only by consideration of all of the facts pertaining to the relationship in any case, including the provisions of the contract, the actual conduct of the parties, and the conditions of the business in which they are engaged, that it can be determined whether the distributor is endowed with that control over his own methods and means of doing the work which is the test of an independent contractor."

What Congress has commanded to be taxed must be taxed. Here the statute taxes employment and nothing else. Both the Commissioner and the taxpayer are subject to the statute and can not by adopting a fiction of the parties shift the burden of tax from those upon whom Congress has placed it.

The majority opinion brushes aside the findings of the trial court and bases its conclusion upon the single fact that there was in form a contract which purported to fix the relationship of the parties. This, I think, is not warranted. The findings of the court being sustained by abundant evidence, the judgments appealed from should be affirmed.