**HAINES et al. v. KAVANAGH, Internal Revenue Collector (CLARK, Intervenor) et al.**

**GRAND TERRACE, Inc., v. SAME.**

**Nos. 5491, 5492.**

District Court, E. D. Michigan, S. D.

March 4, 1947.

706

David I. Hubar, of Detroit, Mich. (Milton M. Maddin, of Detroit, Mich., of counsel), for plaintiffs.

John C. Lehr, U. S. Atty., and Morris Zwerdling, Ass't. U. S. Atty., both of Detroit, Mich., and Rhodes S. Baker, Jr., Sp. Ass't. to Atty. Gen., for defendant.

W. Ralph Jewell, of Detroit, Mich., for Detroit Federation of Musicians.

KOSCINSKI, District Judge.

Plaintiffs-taxpayers seek recovery of social security taxes claimed to have been erroneously collected by defendant Collector of Internal Revenue, during the period from 1936 to 1941. The amount involved is $4,948.68.

The facts of the two cases were conceded by all parties to be substantially the same and the issues identical, and by consent of the respective counsel the cases were tried together by this court.

Lowry Clark, a band leader whose musical organization was one of the bands involved in the subject matter of these cases, intervened in both cases as a party defendant.

At the hearing it appeared from the testimony of the majority of the witnesses, including the officers of the plaintiff corporations, that the nature of the relationship between the plaintiff corporations and the leaders of the orchestras with respect to which taxes were assessed, was in each case the same. Plaintiffs have conceded in their proposed findings of fact that the testimony of the witnesses governs all of the bands involved in the period for which taxes were assessed so that whatever might be the conclusion of this court on the trial of this cause, it would apply equally to all the bands involved.

Some of the leaders of the bands, believing that they were the employers of the members of these organizations or that they would be so held liable, withheld the

required taxes and in some instances made payments to the Collector. However, the intervenor, Lowry Clark, after he had withheld taxes for a period of time, made claim to the Collector that it was not his obligation to collect and pay the taxes because he should not be considered the employer, but that the ballroom operators should be considered the employers and be liable as such. The Collector made an investigation as to the facts and circumstances concerning the relationship of Clark and his orchestra with the plaintiffs and determined that Clark was not liable for the collection and payment of taxes as an employer.

The plaintiffs claim that certain pertinent facts admitted by Mr. Clark in his testimony were not given to the Collector at that time and which conceivably would have materially altered the conclusion of the Collector in this regard. In the findings of fact and conclusions of law hereinafter set forth the court has given due consideration to Clark's testimony, as well as that of all the other witnesses produced by both sides.

The Collector arrived at his determination by examining the records of the plaintiffs and taking into account the facts and circumstances concerning the relationship of the various orchestras with the plaintiff. In determining the extent of the liability of the plaintiffs, the Collector made a distinction, under which it was concluded by him that the plaintiffs were not liable for taxes during the times when so-called "name bands" were engaged but were liable for taxes of members of so-called "local bands". It should be here indicated that the Collector appreciated the possibility that this grouping to determine liability might not be correct in all instances and invited the parties to present facts in relation to any engagement for independent ruling or determination.

The parties by stipulation and agreement having eliminated all minor questions, the principal issue remains for the determination by this court. It was agreed by all parties that a determination of whether or not the leaders or booking agents operating musical organizations were independent contractors or whether the leaders and members of the musical organizations were held to be employees of the ballroom operators would determine the rights of the parties to these actions.

After four days of taking testimony and oral argument, the parties filed exhaustive briefs which were very helpful to the court in deciding the issues presented here.

In arriving at the findings of facts made, the court not only had the benefit of hearing the witnesses in open court, but had the advantage of a transcript of all the testimony taken at the trial and the opportunity to refer to it after briefs were filed by counsel.

The court has carefully examined the proposed findings of fact submitted by both parties at its request. The defendant's proposed findings embody the ultimate facts which, this court has concluded, have been established by the evidence. Consequently, this court has adopted them in form and substance as its findings, as follows:

### Findings of Fact

1. These actions, which were consolidated and tried together, are suits for the recovery of taxes totalling $4,947.28 paid by taxpayers under Title VIII of the Social Security Act, 42 U.S.C.A. § 1001 et seq., and the Federal Insurance Contributions Act, 26 U.S.C.A. Int.Rev.Code, § 1400 et seq., and Title IX of the Social Security Act, 42 U.S.C.A. § 1101 et seq., and the Federal Unemployment Tax Act, 26 U.S.C.A. Int.Rev.Code, § 1600 et seq.

2. The stipulation on file and the stipulation dictated into the record deal with the amounts involved for the years in question, and also the individual leaders and their orchestras on whom tax was paid and refund demanded.

3. During the taxable period, 1936 to March 31, 1941, taxpayers were Michigan corporations engaged in the operating of public ballrooms in the City of Detroit. Their establishments were known as Graystone Ballroom and Grand Terrace Ballroom.

4. Taxpayers engaged the services of many different orchestras and their leaders during the taxable period to provide dance music for taxpayers' patrons. No taxes were assessed by the Commissioner of In-

ternal Revenue in regard to remuneration paid by taxpayers to orchestras of national reputation. Such orchestras came to taxpayers' ballrooms from outside the city and generally played only one night stands. The assessments involved were made only with respect to orchestras and leaders of purely local reputation, orchestras which the Commissioner contended were "nonname" bands.

5. A portion of the assessments involved were made with respect to the remuneration paid by taxpayers to Lowry Clark and his orchestra. In 1938, the Deputy Commissioner of Internal Revenue ruled that Clark and the musicians who comprised his orchestra were employees of the Graystone Ballroom for social security tax purposes. On motion, Clark was permitted to intervene as a defendant.

6. The same individuals were officers in the two taxpayer corporations involved. Their methods of operation in each ballroom were substantially the same. While only four of the leaders involved testified, the evidence and stipulations showed that the relationship which existed between taxpayers and the said four leaders was typical of the relationship which existed between taxpayers and all the leaders involved.

7. The individual musicians, or "sidemen", in the various orchestras were concededly employees for social security tax purposes of either their leader or taxpayers. The real question at issue concerns the status for social security tax purposes of the various leaders.

8. Taxpayers contracted in writing for the services of each orchestra involved on forms prescribed by the local union of the American Federation of Musicians. Two different contract forms were employed, one when taxpayers negotiated for the services of an orchestra through a booking agency and the other when taxpayers negotiated directly with the leader. The latter was the form most generally used. Both forms provided that the leader, as agent for the musicians, would furnish a specified number of musicians for a lump sum of money, payable weekly, the place of engagement and the hours of playing also being specified. The lump sum was paid to the leader who distributed it to the musicians. The by-laws of the union were, by reference, incorporated in the contracts. The booking agency form referred to the orchestra as the "attraction" and the ballroom as the "employer". The engagement, when obtained under this form of contract, was not subject to cancellation. The other form of contract did not refer to the ballroom as the "employer", but the engagement was subject to termination at any time on two weeks' notice. The services of all the leaders who testified were contracted for directly with the leader for engagements lasting for substantial periods of time, ranging from several weeks to several months. One of the orchestras involved performed services for taxpayers during a substantial portion of each of the taxable years.

9. Section 29 of the constitution, by-laws and standing resolutions of the American Federation of Musicians provides as follows: "Members of the Federation are only permitted to accept, solicit or negotiate engagements to play in bands or orchestras from members who contract to furnish bands or orchestras, never from the employers or the agents of such to whom the band or orchestra is furnished."

The by-laws are, by reference, made a part of the contracts. This section of the by-laws designated the parties to whom the band or orchestra is furnished as the "employers". There is nothing in the by-laws which prohibits the leaders, as union contractors and as agents for the musicians, from accepting, soliciting or negotiating a contract of employment for themselves and the musicians with the "employers".

10. The true relationship at issue is to be determined by the presence or absence of no single evidentiary factor, but by an overall view. Whatever the relationship was when the contracts were executed the facts show that after performance under the contracts commenced, taxpayers exercised, or possessed the right to exercise, control over the leaders and their musicians to any degree reasonably necessary to the proper performance of the duties for which they were engaged. In short, there was little the leaders could do which

taxpayers couldn't veto. In support of this finding, the evidence showed the following:

(a) Taxpayers determined the number of musicians to be included in each orchestra.

(b) The total contract price was, in most instances, controlled by union scale for each musician and the leader.

(c) Taxpayers, on several occasions, required the orchestras to be reduced in size. When this occurred, the total contract price was reduced accordingly.

(d) Taxpayers actively participated in the formation of some of the orchestras, designating the style of music to be played, the uniforms to be worn and certain individuals to be included or excluded from the personnel of the orchestras.

(e) Before contracts were signed, taxpayers familiarized the leaders with the house rules, such as the prohibition against smoking and drinking, and with the general style of music desired. The hours of play were also agreed upon.

(f) After performance under the contracts commenced, taxpayers fixed the exact periods during each evening when waltzes and fox-trots should be played and permitted the leaders no discretion in this regard.

(g) Taxpayers disapproved of certain types of entertainment, including tempo and style of music, or the work of certain individuals in the orchestras. They directed the manner in which soloists were to be featured and the use of novelties. They required the orchestras to perform in conjunction with other entertainers who were admittedly taxpayers' employees, such as singers and guest conductors.

(h) Several changes in the personnel of various orchestras were made at the instance of taxpayers, taxpayers taking part in the determination of who was to be let go and who were to be the replacements.

(i) Frequent meetings were held between the management and leaders at which matters affecting the performance or personnel of the orchestras were discussed. Whenever taxpayers and the leaders disagreed, taxpayers always prevailed.

(j) Taxpayers hired guest conductors of their own volition. The guest conductors were entrusted with the duty of standing in front of the orchestras and directing the tempo and selecting the numbers to be played. They were agents of taxpayers. In such instances, the orchestras were billed under the name of the guest conductors and not under the names of the leaders who contracted to furnish the orchestras.

(k) Taxpayers dealt directly with the leaders, never with the individual musicians. The leaders fitted into the relationship in much the same manner as a foreman, the instructions of the management being channeled through the leaders to the musicians.

(l) Taxpayers engaged the services of the leaders and orchestras involved with the expectation of profit to taxpayers. All services were performed on taxpayers' premises. At the Grand Terrace Ballroom, during a portion of the taxable period, taxpayers sold intoxicants and changed the playing schedule of the orchestras in order to facilitate such sales.

(m) Taxpayers furnished at their own expense implements for facilitating the performance of the orchestras, including the bandstand, chairs, racks, microphones, piano and loud speakers.

(n) Taxpayers bore the cost of advertising the orchestras involved;

(o) Taxpayers designated, and at times, changed the place where the orchestras were to perform;

(p) Taxpayers required the leader to act as master of ceremonies in connection with "talent contests" and to play any music specially required by the contestants in the tempo, style and manner which best suited the individual contestants;

(q) Taxpayers gave constant attention to see that their own ideas of first-class showmanship or performance were carried out;

(r) The services which the leaders and musicians rendered to taxpayers were personal and non-delegable.

(s) None of the orchestras, during the period involved, had developed a style of music peculiarly their own and had not acquired a reputation of sufficient importance to fill high priced engagements in

desirable establishments throughout the country. The personnel of most of the orchestras was unfixed and unstable even during the course of individual engagements. Some of the orchestras were organized solely for the purpose of filling a particular engagement and were disbanded shortly thereafter. None of the orchestras were permanent business organizations and were not held out to the public as such. All of the orchestras involved were "non-name" orchestras, as that term is understood in the trade as described in Mim. 4651 (1937-2 Cum.Bull. 389).

(t) The musicians were dependent on taxpayers for their employment, rather than on their leaders. The musicians received no remuneration except when actually working. While working for taxpayers they did not solicit the public at large.

(u) Neither the leaders nor musicians were engaged in an independent business for profit. The evidence showed isolated instances where the amount received by the leader or certain musicians was slightly in excess of the minimum wage provided by the union, but taxpayers' own testimony established that the contract price was based on scale plus customary overage for special talent and arrangements.

(v) Taxpayers were free to terminate the status under which the leaders and musicians earned their living at any time, subject merely to two weeks' notice, without redress of any character by the leaders or musicians. Once that status was terminated, the leaders and musicians were in the same position as employees generally who were unemployed.

(w) The leaders and musicians were no more free to resist any directions or suggestions which were given them by taxpayers than employees generally would be free to resist the exercise of control by their employers.

(x) While the leaders and musicians were free to perform their work according to their skills, such freedom was limited by the right of taxpayers to veto or negative any decision they made. While of necessity some of their work was uncontrolled, none of it was uncontrollable.

(y) There was nothing in and about the ballrooms to indicate that taxpayers' business was being carried on by independent contractors. Music was an essential part of taxpayers' business. The success or failure of that business depended largely on the manner in which the leaders and musicians rendered their services. The relationship was so close and the responsibility resting on the leaders and musicians for the success of the business was so large, that taxpayers necessarily reserved to themselves the right to intervene to direct and control the details of the work whenever they thought it necessary or desirable to do so.

(z) The work of the leaders and musicians required no capital or investment other than the cost of their instruments, sheet music and uniforms. Aside from these items, they expended only their labor. None of these items could be considered as a financial contribution to an independent business enterprise entered into for profit.

(aa) When patrons of the ballrooms complained about the music, the leader was criticized by taxpayers.

(bb) The leaders, whenever possible, complied with all directions and requests of taxpayers regarding style or quality of music, even though in order to do so it was necessary to schedule additional rehearsals.

(cc) For several weeks taxpayers engaged, as their employee, an individual to supervise the work of the leaders and musicians in an effort to improve the quality of their music.

(dd) The leaders and musicians regarded taxpayers as their employers and themselves as taxpayers' employees.

(ee) Taxpayers had the power to hire and fire the leaders and musicians in the broad sense that taxpayers could create or terminate the employment, rather than in the narrow sense of determining which of a number of individuals should be chosen to perform or be chosen to be dismissed (although taxpayers were on occasions active in both regards). Whether the leaders and musicians received employment depended on whether taxpayers chose to engage the leaders, for the musicians' employment depended on their leaders' employment.

Whether the leaders and musicians were to have opportunity to render their services at all was entirely within the control of taxpayers.

(ff) Taxpayers had the right to terminate the services of the various orchestras at any time upon giving two-weeks' notice. "Suggestions" or "requests" made by taxpayers to the leaders were expected to be complied with, and were complied with, because they knew, as did taxpayers, that otherwise the engagements would be terminated under the two weeks' notice clause.

### Conclusions of Law

■ 1. The commissioner of Internal Revenue determined that the members of the orchestras, including their leaders, were taxpayers' employees. This determination is presumptively or prima facie correct. United States v. Rindskopf, 105 U.S. 418, 26 L.Ed. 1131; Niles Bement Pond Co. v. United States, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347. The burden is on the taxpayers to establish by competent evidence that the Commissioner erred in making such determination. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991; Gloyd v. Commissioner, 8 Cir., 63 F.2d 649, certiorari denied 290 U.S. 633, 54 S.Ct. 52, 78 L.Ed. 551; Freese v. Jones, 10 Cir., 156 F.2d 454. This they failed to do.

2. Treasury Regulation 106 applicable to the Federal Insurance Contributions Act, Sec. 402.204, and Regulation 107, Sec. 403.204, applicable to the Federal Unemployment Tax Act define "employees" as follows:

"Who are employees. Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee."

3. Thus, these regulations embody substantially the common-law distinction in the relationship of master and servant and that of independent contractor. The Regulations have merely reiterated definitions and tests of the common law for determining master-servant and independent contractor relationships in vicarious tort liability. Birmingham v. Bartels, 8 Cir., 157 F.2d 295, 299.

■ The law is well established that the employer-employee relationship "is to be judged by the presence or absence of no single evidentiary factor, but by an over-all view." Anglim v. Empire Star Mines Co., 9 Cir., 129 F.2d 914, 917. "The test lies in the degree to which the principal may intervene to control the details of the agent's performance." Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715, 717.

■ 4. Regardless of the provisions of any contract the courts will look to the factual situation to determine the relationship between the parties. Griffiths v. Commissioner, 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319.

5. In a footnote to the opinion in Birmingham v. Bartels, supra (page 299 of 157 F.2d), the court made this observation: "Some Circuit Courts of Appeals have de-

clared that the conventional application of these principles governs the liability for social security taxes (citing cases). The Supreme Court, however, has made it clear that in social legislation the employer-employee relation is not necessarily a blueprint of common law concepts, but that under any such statute the area between unequivocal employment and unmistakable entrepreneurial enterprise is entitled to be surveyed and platted in practical industrial and economic perspective and with regard for its special remedial purpose (citing cases)." House Report No. 728, 76th Cong., 1st Sess., p. 76, had in similar vein declared that "a restrictive view of the employer-employee relationship should not be taken in the administration of the federal old age and survivors insurance system, in making coverage determinations."

6. The conclusions herein arrived at, however, were made solely on the basis of the ultimate facts found from the evidence in this case, with due regard to the degree of control exercised by plaintiffs as to method and means of operation of the orchestras while performing under contract with plaintiffs.

7. Plaintiffs operated three ballrooms, the Graystone, Grand Terrace, and the Arcadia. They were in the business of furnishing dance music for profit to those patronizing these places of amusement. The contracts under which the orchestras were hired by plaintiffs in the main are silent as to right of control of the orchestras by plaintiffs. The right of control and degree of control exercised must be found, if at all, from the acts and conduct of the parties during the period of the engagement, which in most instances continued for weeks and sometimes for months beyond the period specified in the contract. Members of the orchestras were interested in having a steady job, and plaintiffs continued the engagements for as long a time as it suited their business interests.

8. In the case of Radio City Music Corp. v. United States, supra, the court stated, "In the case at bar the plaintiff did intervene to some degree", and held the degree of control was insufficient to find a master-servant relationship. Here, the constant intervention by plaintiffs in the prepared musical programs of the orchestras and the radical departures in the forms of entertainment and the character and type of novelties, repeatedly demanded and complied with, together with continuous changes in the personnel of the orchestras made at the request of plaintiffs—all denote substantially more than "intervention to some degree". The cases of Williams v. United States, 7 Cir., 126 F.2d 129, Spillson v. Smith, 7 Cir., 147 F.2d 727, and Palmer v. Unemployment Compensation Comm., 310 Mich. 702, 18 N.W.2d 83, 158 A.L.R. 909, fall into the category of situations described by Judge Hand as disclosing intervention of "some degree" only, and are therefore distinguishable from the situation found here.

9. The Commissioner of Internal Revenue was correct in his determination that the leaders and orchestras involved were taxpayers' employees.

10. Taxpayers had the right to control and direct the leaders and musicians not only as to the result to be accomplished by the work, but also as to the means and methods by which that work was accomplished.

11. The leaders and musicians were taxpayers' employees within the meaning of the applicable provisions of Titles VIII and IX of the Social Security Act and the Federal Unemployment Tax Act and the Federal Insurance Contributions Act during the taxable periods.

12. The court is therefore of the opinion that the legal relationship of the parties was established on the basis of their actions and conduct, following the signing of each of the several written contracts, and that this relationship was that of master and servant.

13. The taxes sought to be recovered by taxpayers were properly collected from taxpayers.

14. The Collector of Internal Revenue is entitled to judgment dismissing taxpayers' complaints with prejudice, together with costs of suit.